Dale **HOPSON**, Administrator of the Estate of Eva B. Hopson, and Dale Hopson, an Individual, Plaintiff,

v.

**UNITED STATES of America,** Defendant.

Civ. A. No. 660.

United States District Court
W. D. Arkansas, El Dorado Division.

Jan. 5, 1956.

---

R. D. Rouse, Prescott, Ark., for plaintiff.

Charles W. Atkinson, U. S. Atty., Henry M. Britt, Asst. U. S. Atty., Fort Smith, Ark., for defendant.

JOHN E. MILLER, District Judge.

### Statement

On October 4, 5, and 6, 1955, this case was tried to the Court without a jury, and at the conclusion of the trial the Court took the case under advisement pending receipt of briefs from the respective parties. The briefs have been received, and the Court, after considering the pleadings, the evidence introduced at the trial, and the briefs of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

### Findings of Fact

1.

The plaintiff, Dale Hopson, is a citizen of Arkansas and resides in Ouachita County in said State. He is the administrator of the estate of Eva B. Hopson, deceased. The defendant is the United States of America, and this is a tort action brought by the plaintiff against the defendant to recover damages individually and on behalf of his deceased wife's estate, because of the alleged negligence of the defendant.

2.

Prior to 1951, the defendant had been operating a Naval Ammunition Depot at Shumaker, Ouachita County, Arkansas. The depot comprises approximately 68,- 890 acres, and there are numerous buildings, machines, etc., located on the property. In 1951, the defendant, by contracts NOrd(f)–1559 and NOrd–11771, turned over to the National Fireworks Ordnance Corporation, hereinafter referred to as NFOC, the facilities owned by the defendant, and thereafter the depot was operated by NFOC under a cost-plus arrangement. The defendant retained ownership of the facilities, but NFOC was charged with the responsibility of maintaining and operating the facilities.

The defendant, and more particularly the Navy Department, had no authority over NFOC and its employees other than to inspect the plant and facilities and to ascertain whether the contracts were being complied with, or whether there were any deviations from the requirements of said contracts.

3.

When one of the departments of NFOC desired to have a new machine or other item built, the department head would discuss his department's needs with the engineering department, the chief engineer being J. Fred Holder, and the Director of Safety, Tom Marsh. If the initial idea met with their approval, the engineering department would design the particular machine, and the plans would then be routed through channels for the approval of interested persons. When the initiating department head and the engineering department had approved the plans, said plans were then routed to the Director of Safety for his approval. If he approved the plans, they were then routed through the local Inspector of Ordnance to the Bureau of Ordnance.

This general procedure was followed in connection with the machine involved in the instant case, and all parties, both NFOC personnel and Navy personnel, approved the plans.

4.

The material NFOC was working with was ballistite powder, which is commonly referred to as grain. This grain is in-

flammable and burns rapidly, and suitable precautions must be taken when it is handled. A grain is hard, although not as hard as wood, and is approximately $2\frac{1}{2}$ to 3 feet long. On the ends and sides of the grain there are inhibitor strips. During the course of the work it is necessary to remove these inhibitor strips from the grain, and formerly the work of removing the inhibitor strips was done with very little protection being afforded the employees doing the work.

As time went on the method of removing inhibitor strips improved somewhat, and as of the first part of 1953 such work was being done with the use of joiner machines. However, even at that time the grains had to be fed by hand, and there was still little protection for the workers.

In the early part of 1953 a need arose for two additional joiner machines which would be used for de-inhibiting grains. At that time the production department, the engineering department, and the Director of Safety, all of whom were employees of NFOC, worked together and planned the Delta joiner machine involved herein. Every effort was made to make the machines and the building in which they were to be situated as safe as possible for all concerned. The particular room or bay in which the two new machines were to be placed had one wall (the one separating the room or bay from the hall traversing the center of the building) of approximately three feet or more in thickness, and the opposite wall was primarily of glass blocks. On the side of the room having a wall three feet thick, there was a large metal door which was air actuated. There was also a door on the opposite side of the bay leading to the outside of the building. The employees were instructed that in the event of fire they were to proceed out the door leading to the outside. The room was built in this manner to minimize damage to the building and to employees in other parts of the building in the event of a fire or an explosion in this particular bay.

In other words, in the event of fire or explosion the wall of glass blocks, being comparatively weak, would be destroyed but the remainder of the building would be relatively unharmed. The bay was divided into two sections by a metal wall, and one machine was to be placed in each section. In the section where the particular Delta joiner involved herein was placed there were eight sprinkler heads which could be operated manually or automatically. On the outside of the building lightning rods were spaced every 50 feet. Employees were required to wear safety shoes while working in the bay, and they were not allowed to have matches or cigarette lighters on their persons.

Employees were instructed not to allow more than two operators and one transit (person hauling grain) in the bay at one time, and not to have more than 10 grains in the bay at any one time. The dollies used to carry the grain were made of aluminum. The floors were of concrete with a sparkproof substance thereon. The motor on the particular machine herein involved was explosive proof; it was grounded to the secondary grounding system; a metal barricade was constructed around the machine; an entrance door and a safety glass door were constructed in the metal barricade.

The electrical system was installed in a manner that would prevent or stop the operation of the machine when either the safety glass door or the entrance door was open.

A carriage was made for the new machines to convey the grains over the cutter head in order to cut off the inhibitors. The cutter head was a cylinder with blades and was rotated by a "V" belt which encircled a pulley on the motor shaft and a pulley on or near the cutter head. The latter pulley was near the bearings of the cutter head. The control for the carriage was located outside the metal barrier. The machine and carriage were made partly of steel and partly of brass in an effort to avoid sparks

Underneath the machine was a metal tank approximately 2½ feet long, 18 inches wide, and 18 inches deep. Water was continually run in the tank and from thence outside the building. There was an air hose which could be used to blow the shavings or particles off the machine and into the water tank. A ventilator extended from the top of the enclosed booth out of the building.

In other words, the three things that were to be avoided were shock, spark, and friction, and all possible safeguards were being made to avoid these three hazards.

### 5.

A machine was operated by one operator and one helper. Generally speaking, the operation was handled as follows. The operator would open the safety glass feed door, remove one grain from the dolly, lay it on the brass carriage, and close and lock the holding bars. Then the feed door would be closed and the large metal door closed. The motor was then started by a button and the operator used a hand wheel causing the carriage to travel slowly over the rotating cutter head of the machine. Each side of the grain would have to be carried across the cutter head several times before the inhibitor strip on that side was completely cut off. The amount of the inhibitor strip which would be cut each time was controlled by raising or lowering part of the joiner machine so that the grain would be carried across the cutter head at the proper height. When the inhibitor strip was removed from one side of the grain, the helper was supposed to push a button which turned off the machine. Then the helper and the operator would open the feed door and the operator would turn the grain over to proceed with the cutting of the next inhibitor strip. However, even if the button was not pushed to cut off the machine, it would be cut off automatically when the feed door was opened. The cutter head rotated very rapidly and would continue turning for a short time after the power was cut off.

### 6.

Frequent inspections were made by Mr. Marsh on behalf of NFOC and by Lt. Herbert L. White, Naval Security and Safety Officer, and the men under him on behalf of the Navy. Mr. Frank R. Renfrow and Mr. James P. Cooper were civilian safety inspectors employed by the Navy and were working under Lt. White.

Renfrow was very zealous in his work and made frequent inspections of the facilities under the control of NFOC. If Renfrow found anything being done which was a deviation from the contracts or was a hazard to Government property or personnel, he would call the matter to the attention of the supervisor of the particular area. If the supervisor agreed with Renfrow's suggestions, he would comply with them. If not, Renfrow would take the matter up with Lt. White. If it was something of a minor nature, White would contact NFOC and discuss the situation. If it were of a serious nature, White would report the condition to the commanding officer, who in turn would take the matter up with Mr. Arthur H. Bird, Plant Manager of NFOC.

Renfrow and the other Navy inspectors had no authority to give orders to NFOC personnel, although it appears that sometimes Renfrow exceeded his authority and attempted to give such orders. In one particular case involving the Fire Department, Mr. Bird found it necessary to take the matter up with the commanding officer.

### 7.

The particular Delta joiner involved herein was placed in the bay, which was bay 3 of Building M–25, on or about March 3, 1953. The machine was first set in place by Harry T. Cathey and John Diffee. The electrician then performed his part of the installation work, and the whole installation was done under the supervision of one of the foremen, James W. Thomason.

After the barricade (the enclosure of the machine) had been constructed, Marsh conducted at least two experiments to ascertain whether the barricade would be sufficient. At least twice he ignited a grain in the barricade and determined that it had sufficient strength to withstand the resulting fire. Although the evidence was not clear on this point, it was probable these tests were conducted before the machine was placed in the barricade.

A great deal of work was done on the machine in preparing it for operation, and on March 13, 1953, Mr. Marsh inspected the machine and approved it for operation. On March 17, 1953, Will McCauley was assigned to operate the machine in question. On that day his helper was George Neal, and apparently the work done on that day was confined mostly to testing operations. Henry J. Childers was assigned as outside machinist, and his duty was to repair the machine in the event repairs were needed. While the machine was being operated on the 17th, Childers, McCauley, and Neal each noticed that some smoke was coming from the machine, but Childers apparently thought this was a normal result of the operation of such a machine. During the day Mr. Renfrow inspected the machine, and according to the testimony of Neal stated that the machine needed some additional work done upon it. However, Mr. Thomason, the supervisor, and Mr. Marsh, Safety Director, examined the machine on the 17th and both of them determined that the machine was operating properly. Neither of them noticed any smoke.

On March 18, 1953, the operator again was Will McCauley. At her request, the deceased, Eva B. Hopson, was assigned as a helper for McCauley. During the morning they began operation of the machine, and while they were operating it Renfrow came by and looked at the machine. The evidence is conflicting as to whether Renfrow stated at that time the machine was dangerous and should be shut down. The Court is of the opinion that he made such a statement, but in any event, the employees continued to operate the machine. Later in the morning a Naval Officer looked at the machine and also made some statement to the effect that the machine should not be operating. Nevertheless, the employees continued to operate the machine. This was probably because James Thomason also inspected the machine that morning, and was of the opinion that it was operating properly. C. T. Hernsburger, supervisor of production, was also in and out of the bay on the 18th and saw nothing unusual about the operation of the machine. Evidently the machine was operated in the general manner heretofore described in Finding of Fact No. 5, except that the deceased, Eva B. Hopson, did not push the button to stop the machine each time. Instead, she would merely raise the feed door, which automatically cut off the machine. Shortly after 11 a. m., McCauley and Eva B. Hopson were operating the machine and were the only persons in the bay. They raised the feed door in order to permit McCauley to turn a grain over, and at the time they did so the grain became ignited and flames shot out through the feed door striking McCauley in the face. McCauley saw a small flame near a pulley wheel immediately before the grain burst into flame, but Eva B. Hopson was of the opinion that the fire "started up big". McCauley was standing near the exit door and immediately ran through said door. Eva B. Hopson was standing toward the opposite side of the machine and when she started for the door the flames apparently hit her with full force. She was not able to get out of the bay until help arrived. She was taken to the hospital and was conscious until late in the afternoon, and died at approximately 8 p. m.

The witnesses were in disagreement as to whether there was an explosion or merely a severe fire. In any event, a large portion of the glass block wall was destroyed and noise and vibration could be detected for some distance. After the incident had occurred, James Thomason, Lt. White, R. H. McCollum, superintendent of the line maintenance department,

and Fred Futch, an outside machinist foreman, each examined the machine. The cutter head appeared to be running freely and little damage was discovered to the machine. They were unable to determine what had caused the fire.

Marsh also examined the machine after the fire and could find no defects. He took the cutter head to the machine shop and Leo Link, a tool and die maker, examined the cutter head, particularly with reference to whether the blades were in properly and were sharp. No defects were discovered.

8.

A considerable amount of the testimony was directed to the question of cutter heads. At and prior to the time of the fire, two cutter heads were being made for each new machine, and these cutter heads had not been completed at the time of the fire. There was some evidence that sometime prior to the fire McCollum had inquired about borrowing a cutter head from the machine shop. However, there was no evidence that this was actually done.

There was also a conflict in the evidence as to whether the cutter heads on the older machines were interchangeable with the cutter heads on the new machines. However, the Court feels that this conflict is immaterial since the evidence establishes that both before and after the fire the cutter head which was in this particular machine was inspected and found to be working properly.

9.

The deceased, Eva B. Hopson, had worked for NFOC from August 16, 1951, to October 3, 1952. During that time her salary ranged from $1.20 per hour to $1.485 per hour. On March 16, 1953, she returned to work at a salary of $1.67 per hour. She was classified as a production operator, and received 6 cents per hour additional pay as hazard pay. As heretofore stated, she died at approximately 8 p. m. the evening of March 18, and suffered considerable physical pain and mental anguish between the time of her injury and her death.

The deceased had been married before and had three children by her former marriage. She married the plaintiff in 1949. Her son, who is 17 years of age, is living with her former husband and she did not support him, although from time to time she may have given him small amounts of money. Her two daughters, aged 13 and 15, lived with her and the plaintiff. Both she and the plaintiff worked, and they pooled their money to pay the expenses of the two girls and themselves.

On April 29, 1953, the Arkansas Workmen's Compensation Commission made a finding of fact on Claim No. A–306839 that Ivory Jean Buford and Carrie Faye Buford, the minor children of Eva B. Hopson, deceased, were 50 percent partially dependent upon the deceased.

Immediately prior to the employment of Eva B. Hopson by the NFOC, she was earning $15 per week as a domestic servant.

Discussion

Plaintiff's theory of recovery is based upon two primary contentions: (1) that the Navy inspectors, particularly Renfrow, were employees of the United States and were guilty of negligence which proximately caused the death of plaintiff's decedent; (2) that NFOC was not an independent contractor, and that its purported employees, who were actually employees of the United States, were guilty of negligence.

As to plaintiff's first contention, if Renfrow or other Navy inspectors were in fact guilty of negligence proximately causing the death of Eva B. Hopson, deceased, plaintiff would be entitled to recover in the instant case. This is true since plaintiff's claim would fall squarely within the provisions of 28 U.S.C.A. § 1346. That is, Renfrow and the other Navy inspectors were clearly employees of the Government and were acting within the scope of their employment when the alleged negligence occurred, and under the law of the place (Arkansas)

where the negligence allegedly occurred the United States, if a private person, would be liable to the plaintiff. And this is true regardless of whether or not NFOC was an independent contractor. Humphries v. Kendall, 195 Ark. 45, 111 S.W.2d 492; Meyer v. Moore, 195 Ark. 1114, 115 S.W.2d 1087.

Nor would plaintiff's claim be barred by the discretionary function exclusion contained in 28 U.S.C.A. § 2680(a). In this regard, the decision of the Navy to carry on the work involved herein, and particularly to permit the construction of the de-inhibitor machines, may have involved a discretionary function. Dalehite v. United States, 346 U.S. 15, 73 S. Ct. 956, 97 L.Ed. 1427. But, any negligence on the part of the employees of the Government in installing, operating or inspecting the machines, after the decision to construct them had been made, would be actionable. See, Eastern Air Lines v. Union Trust Co., 95 U.S.App. D.C. 189, 221 F.2d 62, 73–78, appeal pending.

■■ Thus, plaintiff is entitled to recover if he has established negligence on the part of Renfrow or any other Government employee, and in this connection the burden of proof is upon plaintiff to establish his case. The Court has concluded that plaintiff has failed to establish any negligence on the part of Renfrow or any other Government employee.

Certainly there was no negligence in the planning or constructing of the particular de-inhibitor machine involved in the instant case. In fact, both NFOC and Navy personnel made every effort to plan and to construct the deinhibitor machines in the safest possible manner.

It follows that the only possible grounds of negligence which could be attributed to the Government employees was negligence in the inspection of the de-inhibitor machine. The evidence in this regard established that several preliminary inspections were made by NFOC and by Navy personnel and that no defects were noted. The only evidence indicating that the Government inspectors might have noted a defect or defects in the machines is the testimony that on the day before the fire Renfrow inspected the machine and stated that some additional work was needed, and on the day of the fire Renfrow and a Naval officer each looked at the machine and each made some statement to the effect that the machine should not be operating. The Court has found as a fact that such statements were made, and it is plaintiff's theory that Renfrow was guilty of negligence in that he had knowledge of a defect in the machine and failed to require the machine to be shut down.

The difficulty with plaintiff's position is that Renfrow had no authority over NFOC personnel and could not require them to stop operating the machine. In other words, Renfrow completed the performance of his duty when he inspected the machine, noted what he thought was a defect, and warned those present of the danger. Not having the right or the duty to compel NFOC employees to cease operating the machine, Renfrow's next step, in the event they would not comply with his suggestions, would have been to take the matter up with his superior, Lt. White. In this instance the fire occurred within a short time after Renfrow made his last inspection, and apparently he did not have an opportunity to discuss the matter with Lt. White prior to the time the fire occurred. In any event, there was no evidence that he had notified Lt. White of any possible defect in the de-inhibitor machine.

A consideration of the evidence as a whole convinces the Court that neither Renfrow nor the other Navy inspectors were guilty of negligence and that plaintiff's first contention is without merit.

■ With regard to plaintiff's second contention, i. e., that the employees of NFOC were in fact employees of the Government and were guilty of negligence, the burden of proof is upon plaintiff to prove that such persons were em-

**812**

ployees of the Government. Watt v. United States, D.C.E.D.Ark., 123 F. Supp. 906, 911.

Initially, the question arises as to whether the determination of the employees' status is governed by federal or by state law. Apparently there is little authority upon this particular question, although a number of cases have considered the related question of whether scope of employment is to be determined by state or federal law. In connection with the latter question, there has been a conflict in the authorities as to whether federal or state law governs the determination of scope of employment. See, United States v. Lushbough, 8 Cir., 200 F.2d 717, 720; Marquardt v. United States, D.C.Cal., 115 F.Supp. 160 (noting the conflicting decisions). It appears, however, that this question has been put to rest by the Supreme Court. In Williams v. United States, 9 Cir., 215 F.2d 800, the court held that insofar as members of the military and naval forces were concerned, scope of employment was to be determined by federal law. On appeal the Supreme Court held that the case was controlled by the local law of respondeat superior and remanded the case to the Court of Appeals for consideration in the light of that governing principle. Williams v. United States, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed.

If the question of scope of employment is governed by local law, it would seem to follow that the question of whether or not a person is an employee would also be governed by local law. However, in the instant case it is unnecessary for the court to decide this question since the local law and the federal law are the same.

The statutory definition of " 'employee of the government' ", as used in the Tort Claims Act, "includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S. C.A. § 2671.

The statutory definition makes no mention of the question of master-servant relationship as opposed to an independent contractor relationship, but in Strangi v. United States, 5 Cir., 211 F. 2d 305, at page 307 the Court said:

"The distinction between the master-servant and independent contractor relationship lies largely in the degree of control or right of control retained by the employer over the details of the work as it is being performed, but there is no definite and absolute rule." (Quoting A.L.I., Restatement, Agency, Sec. 220(2)).

See also, Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017. (Holding that persons employed by private contractor operating a government-owned munitions plant under a cost-plus-a-fixed-fee contract with the Government were employees of the contractor and not of the United States.) The Arkansas law is essentially the same as the federal law. The Arkansas rule is stated in Massey v. Poteau Trucking Co., 221 Ark. 589, 592, 254 S. W.2d 959, 961, as follows:

"The rule for determining which of the two relationships exists is that if there is nothing in the contract showing an intent upon the part of the employer to retain control or direction of the manner or methods by which the party claiming to be independent shall perform the work, and there is no direction relating to the physical conduct of the contractor or his employes in the execution of the work, the relation of independent contractor is created. The governing distinction is that if control of the work reserved by the employer is control not only of the result, but also of the means and manner of the performance, then the relation of master and servant necessarily follows. But if control of the means be lacking, and the employer does not undertake to direct

the manner in which the employe shall work in the discharge of his duties, then the relation of independent contractor exists."

To the same effect, see, American Casualty Co. v. Harrison, D.C.W.D.Ark., 96 F.Supp. 537; Moore (Chicago Mill & Lumber Co.) v. Phillips, 197 Ark. 131, 120 S.W.2d 722.

And the right to control, as well as the control actually exercised, is a primary element in the determination of the relationship. Mississippi River Fuel Corp. v. Morris, 183 Ark. 207, 35 S.W.2d 607.

When the relationship of the parties in the instant case is tested in the light of the general rules above quoted, it is clear that NFOC was an independent contractor and that its employees were not employees of the Government. The only control or right to control retained or exercised by the Government was limited to control of the result of the work being performed. It is true that the two contracts entered into between the Government and NFOC contained a number of provisions which are required in all standard Government contracts of this nature, but these provisions were not sufficient to constitute NFOC an employee of the Government. See, Powell v. United States Cartridge Co., supra; Strangi v. United States, supra. It is also true that the Government reserved the right to inspect the plant and facilities, but this was necessary to insure that proper results were obtained, and it did not amount to a control of the manner and method in which the work was being done. Compare, Strangi v. United States, supra; Harger v. Harger, 144 Ark. 375, 222 S.W. 736.

As a matter of fact, it might be noted that even if the employees of NFOC were in fact employees of the Government, plaintiff apparently would be in no better position. This is true since the deceased, Eva B. Hopson, would likewise have been an employee of the Government, and her dependents would have been entitled to compensation under the provisions of 5 U.S.C.A. § 751 et seq.; this remedy of the dependents against the Government would be exclusive and would prevent the prosecution of the instant suit. 5 U.S.C.A. § 757(b). Furthermore, Eva B. Hopson's dependents are receiving Workmen's Compensation benefits under the Arkansas law, and if she had been an employee of the Government, plaintiff could not bring a tort action against her employer, the Government. Sec. 81–1304, Ark.Stats.1947, Ann. (making the Workmen's Compensation benefits the exclusive remedy of an employee against his or her employer); Shultz v. Lion Oil Co., D.C.W.D.Ark., 106 F.Supp. 119.

There remain for consideration two supplemental contentions of the plaintiff. Plaintiff contends, although rather weakly, that this is a proper case for the application of the doctrine of res ipsa loquitur. This contention is clearly without merit, since the machine in question was not in the exclusive control of the defendant, United States. See, United States for the Use and Benefit of Magnolia Petroleum Co. v. H. R. Henderson and Co., D.C.W.D.Ark., 126 F. Supp. 626, 636; Arkansas Power & Light Co. v. Butterworth, 222 Ark. 67, 258 S.W.2d 36; Coca-Cola Bottling Co. of Fort Smith v. Hicks, 215 Ark. 803, 223 S.W.2d 762. Moreover, the doctrine of res ipsa loquitur does not apply unless the evidence in the case has a substantial tendency to show negligence in the defendant and in no one else. Penny v. Gulf Refining Co., 217 Ark. 805, 809, 233 S.W.2d 372, 373. In the instant case the evidence established that the accident could have been caused by negligence on the part of NFOC employees or the deceased, Eva B. Hopson, and thus the res ipsa loquitur doctrine has no application.

The remaining contention of plaintiff is that the work was inherently dangerous and that the Government could not escape liability by delegating the work to an independent contractor. The Arkansas rule in this regard is stat-

ed in Southwestern Bell Telephone Co. v. Smith, 220 Ark. 223, 225, 247 S.W.2d 16, 17, as follows:

" 'While it is true that as a general rule, the employer would not be liable for the negligence of an independent contractor, there are exceptions to this rule. One exception is that where the work to be performed is inherently dangerous, as here, the employer will not be permitted to escape liability for negligent injury to the property of another, by an employee, to whom the employer has delegated, or contracted, the performance of the work.' "

See also, McKennon v. Jones, 219 Ark. 671, 244 S.W.2d 138; Kennedy v. Clayton, 216 Ark. 851, 227 S.W.2d 934; Giem v. Williams, 215 Ark. 705, 222 S.W. 2d 800.

██ Thus, under the Arkansas law the Government if a private person would be liable for the negligence, if any, on the part of the employees of NFOC, and the question is presented as to whether the Government would be liable for such alleged negligence under the Tort Claims Act. The question presents two distinct problems, i. e., (1) whether the nondelegable rule is a type of absolute liability condemned by the Dalehite, case, or (2) whether the nondelegable rule is applicable to federal tort claim actions since the negligent actor is not an employee of the United States.

As to the first problem, there is little question but that the nondelegable rule is a type of absolute liability without fault, inasmuch as the contractor is held liable for the negligence of the independent contractor's employees even though there is no fault whatsoever on the part of the contractor. However, the doctrine of respondeat superior in itself is also a type of absolute liability without fault, since the master is held liable for the negligence of his servant even though the master himself is guilty of no breach of care. See, Comment, Absolute Liability in Arkansas, 8 Ark. Law Review 83, 88.

The Court is of the opinion that the nondelegable rule is comparable to the respondeat superior rule and is not the type of absolute liability without fault which was condemned in the Dalehite case. Contra, Strangi v. United States, supra, at page 308 of 211 F.2d. Stated differently, the Dalehite case merely construes the Tort Claims Act to require "a negligent act" and to be inapplicable to liability based solely upon "ownership of an 'inherently dangerous commodity' or property, or of engaging in an 'extra hazardous' activity". Dalehite v. United States, supra, at page 45 of 346 U.S., at page 972 of 73 S.Ct.

It would seem then that inasmuch as the nondelegable rule requires a negligent act on the part of an employee of an independent contractor, the rule would not be a type of absolute liability prohibited by the Dalehite case.

██ This brings the Court to the second problem, that is, whether the United States can be charged with liability based upon the negligent act of an employee of an independent contractor under the nondelegable rule applicable under the local law.

The Tort Claims Act applies to claims for money damages for death "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred". 28 U.S.C.A. § 1346(b).

The Court has found only one case in which the specific problem was discussed. In United States v. Hull, 1 Cir., 195 F.2d 64, at page 67 the Court said:

"Likewise, there are certain cases where under local law a private person may be liable for injuries resulting from the negligence of a carefully selected independent contractor. Restatement of Torts § 416 et seq. Presumably the United States would not be subject to liability in such a

case under the Federal Tort Claims Act, for it may well be that the negligent independent contractor would not be deemed an 'employee' of the government within the meaning of § 1346(b)."

The Court is convinced that the above quoted dictum in the Hull case is a correct statement of the law. The Supreme Court has interpreted the Tort Claims Act "to require clear relinquishment of sovereign immunity to give jurisdiction for tort actions". Dalehite v. United States, supra, at page 31 of 346 U.S., at page 965 of 73 S.Ct. By its terms the Act is specifically limited to claims based upon negligent or wrongful acts or omissions of "any employee of the Government", and there is nothing in the Act to indicate that Congress intended to extend the liability of the United States to actions founded upon negligent or wrongful acts or omissions of employees of independent contractors.

In other words, the Tort Claims Act can be invoked "only on a 'negligent or wrongful act or omission' of an employee". Dalehite v. United States, supra, at page 44 of 346 U.S., at page 972 of 73 S.Ct. And the Act requires that the employee be an "employee of the Government". Therefore, liability under the Act cannot be predicated upon the alleged negligence of an independent contractor or its employees, when said contractor and employees are not employees of the United States.

It follows that in the instant case the Government cannot be charged with the negligence, if any, on the part of NFOC or its employees, and thus it is unnecessary for the Court to determine whether NFOC or any of its employees were in fact guilty of negligence. Likewise, it is unnecessary for the Court to determine whether the deceased assumed the risk or was guilty of contributory negligence.

### Conclusions of Law

1.

The Court has jurisdiction of the parties to and the subject matter of this action.

2.

NFOC was an independent contractor and the defendant is not chargeable with any alleged acts of negligence on the part of NFOC or its employees.

3.

No employee of the defendant was guilty of any negligence proximately causing the death of Eva B. Hopson, deceased.

4.

Plaintiff is not entitled to recover anything of and from the defendant, and plaintiff's complaint should be dismissed.

A judgment in accordance with the above should be entered.