Marie Berry **DORMAN**, Administratrix of the Estate of Stiles Regland Berry, Deceased, Plaintiff,

v.

**UNITED STATES of America,** Defendant.

Civ. No. 531 L.

United States District Court
D. Nebraska.
April 12, 1967.

Gladwyn A. Youngs and Frederick H. Wagener, Lincoln, Neb., for plaintiff.

Russell J. Blumenthal, Asst. U. S. Atty., Omaha, Neb., for defendant.

## MEMORANDUM

VAN PELT, District Judge.

Plaintiff brings this action under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), to recover damages occasioned by the death of her husband, Stiles Regland Berry. At the time of his death Mr. Berry was employed as a pipefitter by Paul H. Hardeman, Inc., a corporation which was engaged in the installation and testing of the propellant loading system in an Atlas missile silo near Wilber, Nebraska.

On the day of the accident a crew of three employees, Mr. Berry, Sam Glantz, and Clifford Thompson were directed by their foreman, Robert E. Deines, to install a filter element in the N–29 filter of the propellant loading system located on the seventh level of the missile silo. The N–29 filter casing consists of a pipe approximately five feet in length with a cap at the base of the pipe. The cap is secured to the pipe by means of several nuts, and a gasket is located between the cap and the base of the unit. The filter is depicted in plaintiff's exhibit 3.

Using heavy wrenches, the men began loosening the bolts. The bolts being difficult to loosen, one or more members of the crew began pounding the bolts with a hammer wrench when a portion of the

gasket suddenly blew out. The escaping gas under high pressure hit Mr. Berry on the head, and he fell or was knocked over the side. There was no net to break the fall and he was killed instantly when he struck the bottom of the silo, a distance of sixty feet.

The propellant loading system was designed by Bechtel Corporation of San Francisco pursuant to a contract with the defendant. Upon approval of the design, defendant contracted with Paul Hardeman, Inc. to construct, install and test the propellant loading system. The contract executed between defendant and Hardeman provided for Paul Hardeman, Inc., referred to as "the contractor" to furnish all labor, equipment, and materials unless otherwise specified according to specifications furnished by defendant.

The safety program was by contract under the direction and supervision of Western Contracting Corporation, the general contractor, and Hardeman. Defendant had the right to inspect to see that the job was done according to specifications and on time, and to see that the contractor conducted safety meetings. The pipefitters for Hardeman would take instructions only from their foreman, and would not take instructions from government inspectors.

On the day preceding the accident a test had been performed on this system to determine if the equipment could withstand temperature and pressure. Hardeman drew up the plans for this test. The test consisted of causing cold liquid nitrogen to pass through the pipes of the system. The liquid was propelled by pressure, and after the liquid had passed through the pipes it was discharged at ground level.

From the gaseous nitrogen storage tank the first component the pressure would reach was the N-6 valve; from this valve it would proceed to the N-29 filter and then to the N-1, N-2 and N-3 valves. At the conclusion of the test the N-1 valve was closed and then the N-6 valve was closed. It is clear therefore that pressure was locked in between the N-6 valve and the N-1 valve, and this pressurized area included the N-29 filter. Upon completion of the test, Hardeman had the duty to install a filter element in the N-29 filter.

On the morning of the accident Foreman Deines gave instructions to the crew of which Berry was a member. He cautioned the men to be careful because there was probably pressure in the filter casing. He did not give them instructions as to the steps to be taken in carrying out their assignment.

There was testimony that Berry and at least one of the other members of the crew looked at pressure indicating gauges prior to beginning the task of changing the filter. The gauges indicated that there was no pressure. Mr. Deines assumed that the men looked at the wrong gauges. However, it appears from the evidence that the P-1 gauge would show no pressure if the N-6 valve was closed. Although the defendant's witness indicated that the test plans drawn up by Hardeman did not call for the closing of the N-6 valve, Mr. Deines testified that at the conclusion of the test Berry and Thompson closed the N-6 valve. The court concludes that the N-6 valve was closed, and that there was no gauge which would show that pressure was in the N-29 filter casing at the time of the accident. The plaintiff argues, in effect, that the men assumed, and had the right to assume, that the gauges would indicate pressure in the filter casing if there was pressure, and that the gauges indicating zero, the men proceeded on the theory that there was no pressure in the filter casing. After reviewing all of the testimony, however, the court cannot accept this conclusion. Sam Glantz testified:

Q. "On the morning of the incident, before * * * the incident occurred, did you have an understanding that there either was or was not pressure in this particular filter casing?"

A. "Oh, yes, we was notified that there would be pressure there. We knew that, yes."

The men were proceeding on the theory that by slowing removing the bolts on the filter cap, the pressure would slowly seep out or bleed off. Glantz testified: "The pressure as a general rule is released by loosening of the nuts to bleed it off slowly. That was the general procedure." He also testified that the above was the procedure he followed. Deines testified that one of the ways to release pressure was to loosen the nuts on the top of the filter casing and let it bleed off slowly.

█ This method would have been effective had the gasket not stuck. Unfortunately, however, the stuck gasket would not allow the pressure to seep out slowly. The court finds that immediately prior to the accident the men knew of the likelihood of pressure being in the filter and knew of the dangers of such pressure.

The plaintiff claims that the system was improperly designed and did not conform to the standards of the industry. Professor Wieland testified that there should have been a pressure indicating gauge directly on the unit. This opinion is based on the assumpton that the N–29 filter casing was an unfired pressure vessel. The N–29 filter casing was a pipe, however, and the court agrees with the defendant's witnesses that the filter casing should not be classified as an unfired pressure vessel.

█ Clearly there was a safe way to be certain that there was no pressure in the N–29 filter casing: It was to first close the N–6 valve, then open either the N–1, N–2, or N–3 valve by using a "pin box." This procedure would result in any pressure in the filter casing escaping to the liquid oxygen storage tank. Since the N–1, N–2, and N–3 valves can be operated only electrically, however, the use of a "pin box" is necessary. The pin box was removed from the site by one of Hardeman's employees after the test, and thus was not available to the men. While Hardeman may have been negligent as to removal, this was not the negligence of the defendant. The defendant had nothing to do with the pin box or with test procedures. The court concludes that the design of the propellant loading system was a safe design.

█ Consideration must next be given to plaintiff's contention that the defendant, as landowner, was under a non-delegable duty and is thus liable for Hardeman's negligence. It is clear in this case that Hardeman was an independent contractor under Nebraska law. See Reeder v. Kimball Laundry, 129 Neb. 306, 261 N.W. 562 (1935). The reservation by the United States of the right to inspect the work to see that the work was done on time and according to specifications did not change the status of Hardeman as a contractor. Wallach v. United States, 184 F.Supp. 785, (D.N.Y. 1960); Hopson v. United States, 136 F. Supp. 804 (W.D.Ark.1956).

█ Under Nebraska law, "the duty of a contractee to keep premises safe for a servant of the contractor who enters thereupon as an invitee extends only to then existing dangers of which such invitee reasonably is not aware." Dabelstein v. City of Omaha, 132 Neb. 710, 273 N.W. 43, 46 (1937). Even assuming, however, that Nebraska recognizes the theory of non-delegable duty, and extends the benefits of this theory to employees of a contractor, *but* cf. Lipka v. United States, 249 F.Supp. 213, 217 (N.D.N.Y.1965), the court concludes that "the United States cannot be held liable for an independent contractor's negligence, despite a local law concept of non-delegability." Buchanan v. United States, 305 F.2d 738, 745 (8th Cir. 1962) (not deciding this issue); Hopson v. United States, 136 F.Supp. 804, (W.D. Ark.1956).

█ The court concludes that no employee of the defendant was guilty of any negligence proximately causing the death of Mr. Berry and plaintiff is not entitled to recover from the defendant. In view of this disposition of the case it is not

necessary to consider defendant's contention that this activity falls within the discretionary function exception to the Federal Tort Claims Act.

The above shall constitute findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.