ALBERT HANSEN, by His Next Friend, Appellant, v. THE STATE BANK BUILDING COMPANY.

**Contributory Negligence:** USING ELEVATOR. Plaintiff, a boy of eighteen, who was employed in a building in which there were two elevators one of which was used for passengers, and had regular attendants, employed by the owner of the building, while the other had no attendants, and was seldom used, rather than to wait for the elevator in use, went into the other and used it by operating it himself, and in so doing was injured by reason of its being out of repair. He had frequently used it in the same way before, but, without permission, and, so far as shown, without the knowledge of the owner. *Held*, that plaintiff was guilty of contributory negligence, and could not recover of the owner of the building.

*Appeal from Woodbury District Court.*—HON. GEO. W. WAKEFIELD, Judge.

MONDAY, JANUARY 25, 1897.

THE defendant company is the owner of what is known as the "Troy Building," in Sioux City, Iowa. In that building was the office of Bradstreet Company Commercial Agency, and Albert Hanson was in its employ about the eighteenth day of March, 1892. The office of the agency was on the third floor of the building, and in the building were two elevators, known as the east and the west elevator, respectively. On the eighteenth day of March, 1892, Albert Hanson, for whom the action is maintained, being then a minor, eighteen years of age, entered the building on the lower floor, being on his way to the agency, and rang the bell for the west elevator, and, after waiting a short time, and finding it did not

appear, he discovered the door of the east elevator ajar, but with no one in attendance.  He stepped in, and ran it himself to the third floor, where he stopped it, and leaving the door partly open so he could use it to go down, he went into the office and got some reports for delivery, and came back, and as he stepped into the elevator, or was partly in, it started up, and he was carried nearly to the fourth floor, and was in some manner crowded out of the elevator, and fell some thirty-five feet or more, to the bottom of the elevator pit, and was so injured that his lower limbs and the lower part of his body are paralyzed. This action is to recover the damages sustained, on the ground of the defendant's negligence in permiting the elevator to be out of repair.  The petition shows that the operation of the elevator by Hanson was by license or permission of the defendant, and states facts constituting negligence in keeping it in unsuitable condition for such use, and avers diligence on the part of Hanson.  The answer denies the averments as to both the license and the diligence on the part of Hanson.  At the close of plaintiff's evidence, the court, on motion of defendant, directed a verdict for it, and from a judgment thereon, the plaintiff appeals.—*Affirmed.*

*Wright & Hubbard* and *Lynn & Foley* for appellant.

*M. J. Sweeley* and *Lewis & Beardsley* for appellee.

Granger, J.—It seems to be thought in argument that the court, in directing a verdict, based its ruling on the fact of contributory negligence.  The excuse urged for Hansen's attempt to operate the elevator, himself, is the fact that he had many times before done so, and that others, aside from those assigned to

that duty, had been in the habit of so doing. Both
elevators were not used for passengers, except that at
times the janitor of the building would, at noon, use
the east one for that purpose. The west elevator was
the one generally in use for passengers, and two boys
were employed for that purpose, one for day service,
and the other at night. We cannot state how Hansen
came to operate the elevator himself, more concisely
than to quote a part of his testimony, as follows: "Q.
Now, what occasion had you to run the elevator before?
A. I run the elevator just this way: Whenever the
other elevator was not there, I would get in this one,
and run it. Whenever I came in and did not find
the other elevator in its position, and did not want
to wait, I used the one standing there. I knew
that there was a stairway there, and nothing to
prevent me from using it. I had seen the janitor
use the elevator. I did not know whether it was
his duty to run it when the elevator boy was not
there or not. I saw him use it in connection with the
work. The elevator was not in use for passenger
work. Sometimes, when the elevator boy was not
there, he used the elevator for the convenience of the
passengers. I saw Max Foster run it. He was work-
ing in the drug store in the basement at the time. I
think I saw him carrying passengers once. I cannot
say whether the elevator boys were usually in when
Max Foster run it. I do not know that I remember of
ever seeing him in it alone. The man on the top floor
who ran it worked in an office to the left, towards the
south. I do not know his name. I have seen young
Holmes run it. I think his first name is Frank. He
used to work for Dow. At that time he was working
for the *Journal.* I was with him at the time. No one
else was with him. That is the only time I ever saw
him run it. He operated the lever. Found the ele-
vator when we got in at the bottom of the floor. We

got in together.   I rode up with him.   Farrell &
O'Connor were the elevator boys employed at that time.
I do not know if the other elevator boy was employed.
The boy they call Riley was the boy I spoke of a while
ago, who worked for Jackson.   O'Connor was the
one working at the time I got hurt.   Farrell was
working of nights and O'Connor in the daytime,
as I supposed.   I do not know that I met Riley
just before I got hurt.   I think I had seen the engi-
neer's boy running the elevator.   He was carrying
passengers.   I do not know that he was employed.
I do not know Mr. Toy's boy.   I found the door ajar
quite often, and other times opened it when I went
to get in.   I never used a stick.   I opened it with my
finger.   Mr. Duff never came out and told me that
there were boys hired to run the elevator; not that I
remember of.   I could reach in with my finger and
unlock it.   If it was closed, it would remain closed
until I unlocked it in that way.   *   *   *   I saw Mr.
Deland on one or two occasions when I was running
the elevator.   I could not swear that he saw me.   I
was inside, with the door closed, and he was simply
at the entrance.   He was manager of the building.
I saw the janitor on several occasions.   Never talked
with him about the matter of running it, as I remem-
ber of.   Never talked with any of the employes
about my using the elevator, nor Deland or Toy, and
never asked their permission.   I simply, if I was in a
hurry, and could get into the office quicker that way,
would get in and run it without permission."   We
find nothing in the evidence from which it could be
found that the company ever in any way licensed or
permitted any person not in its employ to operate
the elevator.   It does not appear that any person
having authority to grant license or permission,
even knew of such use.   In other parts of his
testimony, Hanson says he used the elevator

himself a hundred times or more. He used it on an average of once or twice a week. He had used it often, and for a long time. It is difficult to see how any person, considering it was not regularly used, could have had a better knowledge of its condition and operation than he. He nowhere pretends that he used the elevator because of license or permission. It does appear that he used it rather than wait a little for the elevator in use. It does not appear that the elevator in use did not afford reasonable facilities for the building. It is thought that such a custom had been established in the use of the elevator in question, by persons not in charge of it, as to justify Hansen in using it as he did. We do not think the evidence fairly tends to show that. It does show that people frequently used it when the other was not there, but it does not show that the use was sanctioned by the management of the building. Nor, except in a few instances, does it appear that such use came to the knowledge of the management. And when it did, in a way to call for an expression of approval or disapproval,—which appears to have been but once,—it was disapproved of. The case is not in line with *Railway Co. v. Stout*, 17 Wallace, 657, or *Clampit v. Railway Co.*, 84 Iowa, 71 (50 N. W. Rep. 673). This is a case in which a person with a safe and convenient way provided for him, without permission, as he says, took an unsafe one, because of which he was injured. This case is more nearly in line with *Pulley v. Railway Co.*, 94 Iowa, 565 (63 N. W. Rep. 328). It is true, in this case there was not the warning, but there is the same failure to adopt a safe course that is provided. The plaintiff is a young man, and the misfortune to him is a great one; but that furnishes no reason why the defendant should be answerable to him in damages. The judgment is AFFIRMED.