Peter BUCHANAN, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16844.

United States Court of Appeals Eighth Circuit.

June 30, 1962.

**740**

Emerson Hopp, Minneapolis, Minn., made argument for appellant and was on the brief.

John J. Connelly, Asst. U. S. Atty., St. Paul, Minn., made argument for appellee and Miles W. Lord, U. S. Atty., was with him on the brief.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

BLACKMUN, Circuit Judge.

On January 28, 1958, Peter Buchanan was seriously injured in the fall of a hoist * on which he was riding. The hoist was in Building 502 at the Twin Cities Arsenal, New Brighton, Minnesota.

Buchanan brought this action under the Federal Tort Claims Act, 28 U.S. C. § 1346(b), to recover damages from the United States for his injuries. As required by 28 U.S.C. § 2402, the case was tried to the court. At the conclusion of all the evidence the trial judge dismissed the complaint on the grounds that Buchanan's employer, Federal Cartridge Corporation, a private firm, was an independent contractor, that the United States was not responsible for Cartridge's negligence, if any, in connection with the hoist, and that the plaintiff was contributorily negligent. 190 F.Supp. 523. Buchanan appeals.

On his appeal the plaintiff urges (a) negligence on the part of the United States; (b) the government's retention of active control over safety matters at the Arsenal; (c) the government's liability even if Cartridge were an independent contractor; (d) lack of contributory negligence of the plaintiff; and (e) the absence of any assumption of risk by the plaintiff.

The Arsenal is a government owned facility constructed at the beginning of World War II for the production of small arms ammunition. It encompasses an area of about 2600 acres, has 7 major buildings, other structures, and a firing range. During the war Cartridge, under government contract, operated the plant and manufactured ammunition there. When the war ended production terminated. Manufacture was resumed in 1950 with the outbreak of the Korean conflict. On August 10 of that year Cartridge and the United States signed another contract by which Cartridge agreed to operate the Arsenal and manufacture ammunition. Building 502 was used for the production of shells until 1954. From 1954 through October 1957 another company provided standby maintenance for the building. Beginning November 1, 1957, Cartridge took over that maintenance. Three months later the plaintiff was injured.

The plaintiff at the time of his injury was a maintenance mechanic employed by Cartridge. He had worked for Cartridge at the Arsenal during the war

---

* Buchanan's counsel insists that the appliance was an "elevator" within existing industrial code and statutory definitions.

We believe our disposition of the case renders the appliance's appellation of no consequence.

years from 1942 to 1946, had been hired again in 1950, and had served as maintenance machinist foreman there from 1951 to 1955.

Building 502 had two stories but no basement. The hoist on which the plaintiff was hurt was the remaining one of ten in the building; these had been installed to move material from the ground floor to the second floor to be emptied into hoppers and fed down by gravity to the next operation. The hoist had a floor 4½ feet by 5½ feet and end walls about 3 feet high. Its front, back and top were open. Running lengthwise 3 feet 9 inches above the floor was a central wooden beam with a pulley. There was also a bar across the front of the hoist and about 3 feet above the floor. The hoist was raised and lowered by a wire cable. This cable passed through the pulley and wound on a rotating drum anchored in the shaft above the second floor. The drum was electrically activated. There were no operating controls inside the hoist. The controls were located on each floor on walls adjacent to the hoist and about 15 inches from the edge of the shaft. The shaft doors on each floor were about 3½ feet high and moved upward to permit entrance. The doors had to be down before the hoist could be activated. There were no weight capacity or "no rider" signs on the hoist or adjacent to the shaft, although the other hoists had all had capacity signs placed on them by Cartridge. The plaintiff conceded that he knew the hoist was for hauling heavy materials rather than passengers.

There were freight elevators in the building with interior controls. There was also a stairway between the floors and within 45 feet of the hoist shaft.

On the day of the accident the plaintiff and Forrest Ward, a co-worker, had been directed by their foreman, also a Cartridge employee, to clean up the second floor. Plaintiff had talked with others about the hoist and had been told that they had used it to haul materials from the second floor. The plaintiff tested the appliance by running it up and down twice. He had been in the building previously and had seen others using the hoist. Together he and Ward placed a 4-wheeled dolly on the hoist on the first floor and then got on themselves. They were able to stand erect. The plaintiff set the lift in motion by reaching outside the shaft over the closed door to the button controls on the adjacent wall. It rose to the second floor without difficulty. There the two men accumulated junk and filled containers with debris. All this was placed on the dolly. The plaintiff then entered the hoist. The dolly was pushed on and Ward entered. He closed the gate, reached out over it to the control panel and pushed the button. The hoist descended about a foot and stopped. The motor continued to run and the cable kept unwinding off the drum. Ward reached for the control button to stop the motor. He was able to get out over the gate but before the plaintiff could do so the hoist dropped to the first floor and the plaintiff was injured. No question is raised as to the hoist's being overloaded.

Ward testified that it was general knowledge around the plant that "we weren't supposed to ride" the hoists, "that we are not supposed to use them for passenger elevators", that "our whole crew understood that, and everyone would ride the elevators all the time", and that "we would just jump on" with the material being hauled up and down. He also said that "the word had been passed down that we weren't supposed to". The plaintiff himself had been given no specific instructions to use or not to use the hoist. He testified that he rode it not merely for convenience but to keep the containers and "some long stuff" from tipping over. The plant manager, the safety director, the department head, the safety inspector, and the plaintiff's machine foreman, all Cartridge people, testified that they had no knowledge that employees rode the hoist.

The safety director also testified that in 1955 he had ordered an annual inspection of all elevators at the Arsenal; that inspections were made by their in-

surance company, by the State Industrial Commission and by an elevator company; and that, however, they did not inspect the hoists "because that is a maintenance function". Apparently Cartridge itself effected inspection of the hoists in all the buildings except Building 502.

 We agree with the trial court (a) that under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), the law of Minnesota governs the question of liability for the plaintiff's injuries, Massachusetts Bonding & Ins. Co. v. United States, 1956, 352 U.S. 128, 129, 77 S.Ct. 186, 1 L.Ed.2d 189; Olson v. United States, 8 Cir., 1949, 175 F.2d 510, 512; Crosby v. Meredith, 4 Cir., 1962, 300 F.2d 323, 324; United States v. Sutro, 9 Cir., 1956, 235 F.2d 499, 500; (b) that under Minnesota law, Cartridge, "because of its contract with the United States, did not by virtue of that fact alone become an agent of the United States" so as to prevent a status on its part as an independent contractor; (c) that the existence of an agency or of an independent contractor relationship "may depend not only upon terms of a contract between parties thereto, but the conduct of the parties operating thereunder as well"; (d) that

"* * * there is no one particular test or type of conduct which determines whether a person is an independent contractor. Each case must be decided upon the facts there presented. * * * Some of the factors considered by the court in determining the question are: (1) Control of the work; (2) control of the premises; (3) control over the means of performance; (4) nature of the work done; (5) supervision of work; (6) control of personnel; (7) furnishing of personnel and material; (8) method of payment; (9) freedom of the contractor in employment policy; and (10) procurement of insurance covering personnel, social security payments, and like items."

Gill v. Northwest Airlines, 1949, 228 Minn. 164, 168–169, 36 N.W.2d 785, 788; (e) that

"The real test, however, 'as to whether a person is an independent contractor or an employe is whether the asserted employer, under his arrangement with the other party, has or has not any authoritative control of the latter with respect to the manner and means in which and by which the details of work are to be performed' (Nesseth v. Skelly Oil Co., 176 Minn. 373, 374, 223 N.W. 608), as distinguished from the right which every owner or general contractor has to supervise and co-ordinate the general work."

Larson v. Le Mere, 1945, 220 Minn. 25, 32, 18 N.W.2d 696, 700; Willner v. Wallinder Sash & Door Co., 1947, 224 Minn. 361, 369, 28 N.W.2d 682, 686; Fahey v. Terp, 1952, 235 Minn. 432, 433, 51 N.W. 2d 273, 274; and (f) that as a general rule one is not liable for the acts of an independent contractor although "it would be proper to say that the rule is now primarily important as a preamble to the catalog of its exceptions". Pacific Fire Ins. Co. v. Kenny Boiler & Mfg. Co., 1937, 201 Minn. 500, 503, 277 N.W. 226, 228; Lamb v. South Unit Jehovah's Witnesses, 1950, 232 Minn. 259, 263, 45 N.W.2d 403, 406, 33 A.L.R.2d 1. It has been said, too, that the burden is upon the plaintiff to show that his case comes within an exception to the rule of non-liability. Union Tank & Supply Co. v. Kelley, 5 Cir., 1948, 167 F.2d 811, 815, cert. den. 335 U.S. 827, 69 S.Ct. 54, 93 L.Ed. 381; Terry v. A. P. Green Fire Brick Co., E.D.Ark., 1958, 164 F.Supp. 184, 188, appeal dismissed, 8 Cir., 268 F.2d 213.

The plaintiff has no quarrel with these propositions of Minnesota law. He argues that, accepting these principles, the United States is liable for his injuries because the government at all times retained active control of the safety program at the Arsenal, and that, in any event, it cannot escape its liability

here by hiring an independent contractor.

*The claim as to the government's retention of control.* The plaintiff here emphasizes (a) Army Regulation No. 385–10, promulgated 30 August 1956, stating that "The prevention of accidents is a responsibility of command" in army operations and with respect to civilian employees as well as military personnel, and also stating that safety standards and codes established by recognized authorities are acceptable as guides except when in conflict with army publications; (b) the several provisions of the Cartridge-government contract to the effect that Cartridge's work, in operation and shutdown, was "subject to the general supervision, direction, control, and approval of the contracting officer to whom the Contractor must report and be responsible"; that Cartridge was to handle materials not immediately needed for use, was to inventory and dispose of perishable tools, and was to maintain the plant in either standby or caretaker status, all as directed or ordered by the government's contracting officer; that it was to store and maintain production line equipment in accord with standards furnished by that officer; and that it was to keep at the site a qualified representative to receive such directions as the contracting officer might give; (c) Ordnance Safety Manual No. 7-224, issued 4 September 1951, as amended, providing that the commanding officer of an ordnance establishment is solely responsible for its safety; that it is his duty "to insure that all activities are conducted in accordance with the safety rules and regulations set forth herein"; that each part of the establishment should be inspected at least monthly for unsafe physical and mechanical conditions; that there should be quarterly inspections of elevators; that there shall be hoist inspections, the frequency of which should be based on specific needs; that carrying capacity shall be posted at all entrances to and in any elevator; that elevators must be equipped with safety catches and automatic limit stops; that elevator shafts and all elevator equipment should be inspected weekly and an inspection report filed; and that elevators should be inspected annually by a qualified agency; (d) Ordnance Corps Manual No. 6–75, issued April 1953, relating to control of government property in possession of contractors, stating that contract provisions regarding the procurement or manufacture of facilities for the government generally will provide for inspection thereof as a prerequisite to reimbursement of the contractor; (e) an additional manual, dated 30 April 1956, also relating to control of government property in possession of contractors, describing the function of the government's contract administrator in the supervision of government property; (f) Army Regulation No. 210–10, promulgated 8 June 1954, outlining the general duties of a commander over an installation such as an arsenal; (g) a letter, dated 1 November 1957, from the government's contracting officer to Cartridge, and written when Cartridge took over Building 502, instructing Cartridge to conduct its operations "on a Caretaker Maintenance Standard" to consist of a "minimum surveillance inspection program which will ascertain if the buildings are weather tight and structurally sound and that shell producing facilities are not starting to deteriorate", and further stating that mobilization lead time for the building was 180 days instead of 90 days; (h) a letter, dated 17 April 1958, from that representative to Cartridge, stating that the physical condition of Building 502 met the caretaker status criteria, that the writer's office was cognizant of certain existing conditions which did not affect the building's stability, and that the standard of maintenance of the building, before reverting to caretaker status, was in compliance with the contract between the government and the predecessor contractor; and (i) the testimony of a former Cartridge department head that Cartridge was to keep Building 502 in a standby condition, "in other words, maintain it, very little maintenance on the machines, but to ob-

serve, go in there periodically and check to see that no equipment was deteriorating, preservatives were holding up, and just do regular routine stand-by maintenance".

We appreciate the nature and force of the plaintiff's argument. The record, however, contains opposing material. It discloses that Cartridge employed an engineer whose fulltime job was the direction of safety at the Arsenal; that this engineer had three safety inspectors working under him; that Cartridge endeavored to meet its contract obligation to maintain a maximum degree of safety in the plant; that its program included talks, movies, posters, inspections by Cartridge employees, and by insurance, elevator company, and state inspectors; that, specifically, Building 502 was inspected by a Cartridge employee; that the safety engineer had ordered annual elevator inspections; that the Ordnance Safety Manual No. 7-224 was, by the contract between the parties, only a guide; that, as to a building under standby maintenance, Cartridge "had the same obligation to the Government to see that our people were operating safely there as in any other building"; that the Ordnance Corps employed a civilian named O'Malley as a security and safety director charged with the duty to oversee Cartridge's program; and that the 45 government employees at the Arsenal for whom O'Malley had direct safety responsibility were in addition to several hundred persons employed there at the time by Cartridge.

All this indicates that Cartridge had an extensive safety program continuously in effect at the Arsenal. It is of interest to note, also, that under Cartridge's contract with the government it warranted that it maintained with responsible carriers adequate insurance against liability on account of damage to persons or property and adequate insurance under applicable workmen's compensation laws; that it specifically agreed to maintain such coverage until the work under the contract had been completed; that Cartridge would be reimbursed for the cost of the compensation insurance; that Cartridge "would endeavor to maintain the maximum degree of safety at all times in the operation of this plant"; that Cartridge, "as an independent contractor and not as an agent of the government", would furnish labor, equipment, supplies, and the like; that the agreement between the United States and the interim contractor also had described the latter as an independent contractor and not as a government agent; and that the Ordnance Safety Manual specified in Cartridge's contract as a guide provided that "unless specifically designed for passenger service, personnel should not be permitted to ride in elevators". Cartridge's plant manager testified that they ran the plant as if it was their own business and without any government contact or supervision.

█ It is apparent that there was present, as there nearly always is, a distinct element of overriding general control on the part of the government over the arsenal property. This, however, strikes us as being no different than that interest and general control ordinarily exercised by an owner over his property which, by lease or other contract, is in the hands of another. We suspect that the contract provisions here as to overriding authority are largely standard phrases of government agreements. Much of the "control" was exercised in the necessary direction of seeing that Cartridge's obligations to the government were fulfilled and not in the direction of the government taking over those obligations itself. In Powell v. United States Cartridge Co., 1950, 339 U.S. 497, 507, 70 S.Ct. 755, 94 L.Ed. 1017, the Court said, in holding the Fair Labor Standards Act applicable to employees of a private contractor at a government owned munitions plant,

"It was essential that the Government supervise closely the expenditures made and the specifications and standards established by it. These incidents of the program did not, however, prevent the placing

of managerial responsibility upon independent contractors."

In United States v. Silk, 1947, 331 U.S. 704, 719, 67 S.Ct. 1463, 91 L.Ed. 1757, the Court also observed that it is "the total situation" which is determinative. We conclude, as did the trial court, that, although the government retained title to the property, the total situation here reveals the absence of that kind of control on the part of the government which would make it liable for the negligence, if any, of Cartridge; that the United States did not possess that "authoritative control" prescribed by Larson v. Le Mere and its companion cases, supra; and that it is Cartridge's posture, not the government's, which met the tests noted by the Gill case, supra. Cf. Hopson v. United States, W.D.Ark., 1956, 136 F.Supp. 804, 806, 813; Dixon v. United States, 8 Cir., 1961, 296 F.2d 556, 558–559; Strangi v. United States, 5 Cir., 1954, 211 F.2d 305; Kirk v. United States, 9 Cir., 1959, 270 F.2d 110, 116–117.

*The claim as to the government's inability to escape liability by hiring an independent contractor.* We may accept for present purposes the plaintiff's argument that, inasmuch as he was on the arsenal premises as an employee of Cartridge, he was a business guest and not a mere licensee, Standafer v. First National Bank, 1955, 243 Minn. 442, 446, 68 N.W.2d 362, 365, and that the owner of property is liable to a business guest if by the exercise of reasonable care he could have discovered a condition which involves an unreasonable risk to the guest, or if he permits the guest to remain on the property without exercising reasonable care to make the condition safe or to give him adequate warning, or if, although he entrusts work to an independent contractor, he retains control and fails to exercise that control with reasonable care, Restatement of the Law of Torts, §§ 343, 344, 414, or if he fails to exercise reasonable care to select a competent independent contractor and to provide in his contract for proper precautions, or if he furnishes

equipment but retains control and fails to exercise reasonable care for the protection of others, Prosser, The Law of Torts, (2d Ed. 1955) § 64.

Setting aside the distinct possibility that, on the theory an independent contractor is not an "employee" under the Federal Tort Claims Act, the United States cannot be held liable for an independent contractor's negligence, despite a local law concept of non-delegability, see United States v. Hull, 1 Cir., 1952, 195 F.2d 64, 67; Hopson v. United States, supra, W.D.Ark., 136 F.Supp. 804, 814–815; Benson v. United States, N.D.Cal., 1957, 150 F.Supp. 610, 612,— an issue we do not now decide—it is apparent that the facts here do not fit those upon which the plaintiff's suggested legal propositions rest. There is no contention that there was lack of due care in the selection of Cartridge. The government had not been in possession or control of the premises since at least 1950. During that entire period, with the exception of the interval from 1954 to October 31, 1957, Cartridge had been in possession and had been operating the property. Although Cartridge was not there during the excepted period, another contractor was and the record contains no showing that the government at any time reassumed possession between the occupancies by Cartridge and the interim contractor. This is not a case of the kind illustrated by decisions cited by the plaintiff where the independent contractor is employed to perform a piece of work and at the time of the owner's acceptance of that work it knew or ought to have known from a reasonable inspection that the work was defective.

The plaintiff urges upon us our case of Blackhawk Hotels Company v. Bonfoey, 8 Cir., 1955, 227 F.2d 232, 56 A.L. R.2d 1047. That case is distinguishable on its facts. The passenger elevator there was under the defendant's control. It was held that the hotel company could not avoid its liability for a guest's injuries because of its having a maintenance contract with an elevator com-

pany. The holding would be pertinent here if the plaintiff could have sued Cartridge and the latter had asserted as a defense its employment of outside inspectors. Furthermore, that case concerned a hotel's supplying passenger elevator service; the hoist here was not intended or supplied for that purpose. Neither the United States nor Cartridge had a duty to furnish passenger elevator transportation. Finally, the Blackhawk case is distinguishable because only elevator maintenance was turned over to the independent contractor; here, complete control of the premises was in Cartridge except for the general overriding supervision which has been mentioned.

We therefore hold that the plaintiff's case cannot be supported on a theory of non-delegable duty.

These conclusions perhaps make it unnecessary for us to consider the remaining points urged by the plaintiff. We might observe, however, that even if we were to reach the opposite conclusion and adopt the plaintiff's position on the foregoing issues, we would readily affirm the trial court's alternative conclusion that the plaintiff was contributorily negligent. This conclusion is adequately supported by (a) the plaintiff's voluntary use of the hoist as a passenger conveyance; (b) the absence of instructions that he use the hoist; (c) the general knowledge around the plant, in which he participated, that the hoist was for materials and not for passengers; (d) his awareness of the availability of the freight elevators with interior controls; (e) his general familiarity with freight elevators; (f) his knowledge of the nearby and convenient stairway; (g) the small size of the hoist and of the entrance to it, with the lengthwise pulley beam and the obstructing bar across the front, both less than 4 feet above the floor, and both being adverse to convenient passenger use and contraindicating intended passenger use; (h) the absence of interior controls; (i) the presence of only exterior controls with their location on each floor 15 inches

from the shaft and out of reach when the hoist was between floors; (j) the fact the dolly could have been blocked and the junk and containers carefully arranged, making it unnecessary for the men to ride the hoist; (k) the plaintiff's long employment with Cartridge and his familiarity with the premises and the operation of the arsenal buildings; and (l) his admission that the hoist was for hauling materials rather than passengers. All these factors indicate that the plaintiff's use of the hoist to convey himself between the floors constituted negligence which contributed to the plaintiff's injury.

Of course, as the plaintiff suggests, the defense of contributory negligence is not available where an injured person's actions are not a material element in the happening of the accident. Guile v. Greenberg, 1934, 192 Minn. 548, 551, 257 N.W. 649, 650; Garland v. Nelson, 1944, 219 Minn. 1, 6, 17 N.W.2d 28, 30. But see Holt, J., concurring in Thorstad v. Doyle, 1937, 199 Minn. 543, 553–554, 273 N.W. 255, 260. Causal connection and lack of ordinary care must both be present. Ranum v. Swenson, 1945, 220 Minn. 170, 174, 19 N.W.2d 327, 330; Bush v. Havir, 1958, 253 Minn. 318, 325, 91 N.W.2d 784, 789–790. But causal connection "depends in the last analysis on the application of common sense to the facts of each case". Johnson v. Chicago G. W. Ry. Co., 1954, 242 Minn. 130, 134, 64 N.W.2d 372, 376; Moores v. Northern Pacific Ry., 1909, 108 Minn. 100, 101, 121 N.W. 392. And the plaintiff was bound to exercise due care for his own safety. Flynn v. Arcade Investment Co., 1958, 253 Minn. 107, 111, 91 N.W.2d 113, 115.

We have no difficulty in concluding that this plaintiff did not use due care for his own safety, that he willingly and unjustifiably placed himself on an instrumentality not intended for his presence while in motion, that his lack of care was a contributing cause of his injury, that he failed to conform to the standard to which a reasonable man would conform under the circumstances, and that he

was contributorily negligent as a matter of law within the Minnesota definition set forth in Mayzlik v. Lansing Elevator Co., 1954, 241 Minn. 468, 475, 63 N.W.2d 380, 385, and cases cited, and in Olson v. Duluth, M. & I. R. Ry. Co., 1942, 213 Minn. 106, 114–115, 5 N.W.2d 492, 496–497. See Restatement of the Law of Torts, §§ 463–7. It is no answer to say, as the plaintiff does, that he cannot be held contributorily negligent because his presence in the hoist did not cause it to fall. His negligence may not have caused it to fall, but it did occasion his being improperly on the hoist when it did fall. Compare Landru v. Stensrud, 1945, 219 Minn. 227, 229, 17 N.W.2d 322, 323; St. Paul Hotel Co. v. Lohm, 8 Cir., 1952, 196 F.2d 233; Billows v. Moors, 1894, 162 Mass. 42, 37 N.E. 750; Hansen v. State Bank Bldg. Co., 1897, 100 Iowa 672, 69 N.W. 1020.

There are too many obstacles here for the plaintiff to overcome before the United States can be held liable for his injuries. Those obstacles have not been surmounted. The district court's judgment dismissing the action is therefore affirmed.