**Joseph V. ORLEANS, by his father and next friend, Joseph A. Orleans, et al., Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 74–1496.**

United States Court of Appeals, Sixth Circuit.

Jan. 13, 1975.

**198**

William E. Pfau, Jr., Pfau, Comstock & Spinger, Youngstown, Ohio, James P. Murphy, Squire, Sanders & Dempsey, Charles F. Clarke, Cleveland, Ohio, for plaintiffs-appellants.

Frederick M. Coleman, U. S. Atty., D. D. Weisberger, James Diggs, Cleveland, Ohio, for defendant-appellee.

Before PECK and LIVELY, Circuit Judges, and McALLISTER, Senior Circuit Judge.

LIVELY, Circuit Judge.

This action was filed under the Federal Tort Claims Act to recover for personal injuries suffered by the plaintiff in an automobile accident. Plaintiff was one of a group of children who had been taken to a recreational area some distance from their homes on an outing which was part of the program of the Westlawn Neighborhood Opportunity Center (Westlawn). Westlawn was an "activity" of the Warren-Trumbull Council for Economic Opportunity, Inc. (WTCEO). A van was furnished by WTCEO to Westlawn for the outing, but it was not large enough to carry all the children who turned out for the affair. Employees of WTCEO arranged for two young men from the Westlawn area to drive some of the children to the outing in privately owned automobiles. Plaintiff was a passenger in an automobile driven by Robert Walker and owned by Robert's father on the return trip when the accident occurred.

The complaint alleged that the outing was sponsored by the Office of Economic Opportunity and "that the agents of the United States of America in charge of said outing were negligent in the organization and supervision of said outing . . . " resulting in plaintiff's injuries. The government answered that WTCEO is not an agent or instrumentality of the United States, nor is Westlawn such an instrumentality. In addition, the defendant denied that any agents of the United States were "present during, before, or after the described outing."

The defendant then moved for summary judgment and filed with its motion the affidavit of the regional director of the Office of Economic Opportunity (OEO) having jurisdiction of WTCEO, copies of community action program grants from OEO to WTCEO and a copy of an unpublished district court opinion. The gist of the regional director's affidavit is that the supervisors of WTCEO and Westlawn were not employees of OEO on the date of the accident and that these organizations "make their own decisions as to whom to hire, discipline and discharge." It states that

OEO involvement in personnel decisions of WTCEO and Westlawn "is limited to the issuance of standards." The affidavit concludes with the statment that OEO does not supervise "either on a day-to-day basis or otherwise" the activities of employees of the two organizations and that the employees are not "subject to OEO supervision or control as to the quantity or quality of the work product they produce."

In opposition to summary judgment the plaintiff filed affidavits of the chairman of the governing board of WTCEO and an attorney who had participated in the organization and management of WTCEO. In his affidavit the board chairman stated that he was appointed directly by the Regional Office of OEO and "that presently the entire funding of the Warren-Trumbull Council for Economic Opportunity is by funds of the United States except for some so-called 'in kind' contributions, and that to his knowledge this is and has been the case throughout the history" of WTCEO. The affidavit of the attorney-board member contained *inter alia*, these statements:

That the corporation was formed for the purpose of obtaining funds made available through the Economic Opportunity Act of 1964 and to act primarily as an instrumentality of the United States by carrying out the purposes of the Economic Opportunity Act. The corporation was carefully organized and the by-laws and regulations tailored to come within the restrictions of the Economic Opportunity Act.

After the organization of the Warren Council for Economic Opportunity, Inc., it was funded almost totally by Federal funds made available through the Economic Opportunity Act, the only exception being some credit that may have been given for "in kind" services rendered by local citizens. Its management and operation were under the direct supervision of the Regional Director of the Office of Economic Opportunity in Chicago.

The projects undertaken were those suggested by the Economic Opportunity Act or the directives of the Economic Opportunity Administration.

One of the projects undertaken by the Warren Council for Economic Opportunity, Inc. was the Westlawn Neighborhood Opportunity Center, which project was set up in accordance with the provisions of the Economic Opportunity Act of 1964 and more specifically, that portion at 42 U.S.Code Annotated, Section 2811,

\* \* \* \* \* \*

The Affiant says that from the time of the organization of the Warren Council for Economic Opportunity, Inc. and the Westlawn Neighborhood Opportunity Center, the Warren Council for Economic Opportunity, Inc. and Westlawn Neighborhood Opportunity Center acted as agencies to serve and assist the poor in methods and manners outlined and prescribed by the Economic Opportunity Act and numerous instructions, restrictions and requirements of the Director of the Office of Economic Opportunity. These instructions and requirements directed the manner in which the Warren Council for Economic Opportunity, Inc. and the Westlawn Neighborhood Opportunity Center be organized, the classes of persons who were to be employed as directors or serve as trustees, the nature and purpose of the projects to be undertaken and the methods for carrying out such projects. Before funding was granted, the United States of America, through the Office of the Director of Economic Opportunity and his regional directors, was required to approve projects and the outlined approach for conducting them. After a project was approved, its operation was supervised by the Office of the Regional Directors in Chicago.

Without the Economic Opportunity Act and the funds made available thereunder, the Warren Council for Economic Opportunity, Inc. would not have been created and could not have operated or existed.

The plaintiff also filed depositions of a former employee of Westlawn, the for-

mer director of WTCEO and of the regional director of OEO whose affidavit had been filed by defendant. These depositions explored the relations between OEO and the local organizations, particularly with respect to personnel matters, funding and selection of projects.

In granting summary judgment for the defendant the district court found that no issue as to any material fact existed and accepted as true the following "four basic facts" urged by the plaintiff:

First, the Warren-Trumbull Council for Economic Opportunity, Inc. was created for the purpose of carrying out the community action programs, contained in the Economic Opportunity Act of 1964. Second, the Warren-Trumbull Council and its activity, the Westlawn Neighborhood Opportunity Center, received funds from no source other than the Office of Economic Opportunity. Third, the Council conducted no programs other than those formulated and funded by the federal government. Fourth, the Office of Economic Opportunity and its regional office in Chicago exercised close supervision over the Council and its activities.

The court rejected the plaintiff's conclusion that these facts require a holding that the United States may be sued under provisions of the Federal Tort Claims Act on account of the negligence of an employee of WTCEO or Westlawn. Rather, he found that the defendant was entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.

Under the Federal Tort Claims Act recovery is allowed against the federal government generally in those cases where recovery would be permitted against a private individual or corporate defendant. 28 U.S.C. § 2674. Exclusive jurisdiction of actions for damages under this Act is vested in the district courts. 28 U.S.C. § 1346(b). Since the government acts only through its agents and employees, general principles of *respondeat superior* apply, subject to 28 U.S.C. § 2671 which contains these definitions:

As used in this chapter and sections 1346(b) and 2401(b) of this title, the term "Federal agency" includes the executive departments, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

"Employee of the government" includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

"Acting within the scope of his office or employment", in the case of a member of the military or naval forces of the United States, means acting in line of duty.

The district court concluded that WTCEO is a contractor with OEO and "thus the government is specifically excluded from liability for torts of the employees of the council under 28 U.S.C. § 2671." The court found that the approach to eliminating poverty which Congress adopted in the Economic Opportunity Act of 1964, 42 U.S.C. § 2701 et seq., was basically to rely on local community effort. The purpose of a community action council such as WTCEO is not merely to act as a federal agency to administer federal programs. Rather, the court held, its responsibility is to use local capabilities to coordinate all programs in the community, including state and local programs, as well as federal ones. The fact that WTCEO received no funds other than grants from OEO and conducted no programs other than those initiated by OEO was held to be immaterial. Relying on the charter of WTCEO which permitted it to receive funds from other sources, and various provisions of the Economic Opportunity Act which define the purposes of community action councils and their relations with OEO, the district court held

that WTCEO and Westlawn were not corporations primarily acting as agencies or instrumentalities of the United States. If the two local organizations do not come within the statutory definition of "Federal agency," it follows that the acts and omissions of their employees which were charged in the complaint were not those of "Employee[s] of the government." 28 U.S.C. § 2671.

On appeal, plaintiff contends that WTCEO was not a contractor, but at all times functioned as a "Federal agency" within the definition of Section 2671. In deciding whether a given relationship is that of principal and agent or principal and independent contractor, the courts are concerned primarily with the type and extent of control retained by the principal. Generally, if the principal looks to the other party for results only, leaving to that party discretion as to means and control over the methods and details of performance, the relationship is that of principal and independent contractor. The greater the control, the greater is the likelihood of a finding of agency. In Schetter v. Housing Authority of the City of Erie, 132 F.Supp. 149 (W.D.Pa.1955), the government defended a Federal Tort Claims Act case on the theory that a public housing authority which leased a housing project from the Federal Public Housing Administration was an independent contractor. The court noted numerous provisions of the lease which led it to "conclude that Erie is not an independent contractor since Erie was controlled by the United States with respect to the performance of the undertaking provided by the agreement between the United States and Erie." Id. at 152. See also Toth v. United States, 107 F.Supp. 37 (N.D.Ohio 1952). While a member of the Court of Appeals for the Eighth Circuit, Mr. Justice Blackmun wrote the opinion in Buchanan v. United States, 305 F.2d 738 (1962), which listed some of the factors to be considered in deciding whether a person is an independent contractor as follows: "(1) Control of the work; (2) control of the premises; (3) control over the means

of performance; (4) nature of the work done; (5) supervision of work; (6) control of personnel; (7) furnishing of personnel and material; (8) method of payment; (9) freedom of the contractor in employment policy; and (10) procurement of insurance covering personnel, social security payments, and like items." Id. at 742.

There are a number of cases in which independent contractor status was assumed, but the contention was made that particular circumstances had caused the principal to lose his insulation from liability for negligence of employees of the contractor. In Lipka v. United States, 369 F.2d 288 (2d Cir. 1966), it was held that the independent contractor status of one engaged by the Corps of Engineers was not destroyed by reservation of the power to control the contractor's compliance with specifications or the institution of an accident prevention program. A similar result was reached in United States v. Page, 350 F.2d 28 (10th Cir. 1965), where it was held that reservation of the right to make safety inspections and to require greater safety precautions than those normally practiced by the contractor in question did not make the principal liable for negligent acts of the contractor. See also Gowdy v. United States, 412 F.2d 525 (6th Cir. 1969). On the other hand, the government has been held liable for negligent acts of employees of a contractor whose performance was subject to detailed supervision by a public housing authority. Maryland v. Manor Real Estate & Trust Company, 176 F.2d 414 (4th Cir. 1949). In Logue v. United States, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973), the Supreme Court stated that the purpose of the exclusion of "contractors with the United States" found in Section 2671 is to afford the government the same immunity from tort liability arising out of negligent acts of an employee of a contractor as is enjoyed by private individuals who deal with such contractors. As the Court said, it is based on the "traditional distinction between employees of the princi-

pal and employees of an independent contractor." *Id.* at 527, 93 S.Ct. at 2219. If the principal lacks authority to control the detailed performance of the contractor, it cannot be treated in law as the employer of that contractor's employees. Only if the principal has the right to supervise the "physical performance" of the work of such employees do they become employees of the principal. *Id.* at 531, 93 S.Ct. 2215.

The question in this case is whether a community action council formed for the purposes of the Economic Opportunity Act, which receives funds solely from the federal government and operates within the statutory and regulatory "guidelines" of OEO which are applicable to such councils, is to be deemed a federal agency or an independent contractor with the government when sued by a "client" of the agency claiming injury as the result of negligence on the part of agency employees. In seeking analogies in decisions involving other federally funded programs it is necessary to keep in mind the concept of the importance of using all the resources of the local community to fight poverty which underlies the Economic Opportunity Act of 1964. From the President's message on poverty of March 16, 1964 (S. Doc. No. 86, 88th Cong., 2d Sess. 2–4 (1964)) (hereafter Sen. Doc.) through the Congressional presentation of Sargent Shriver of March 17, 1964 (Sen. Doc. 35–74) and the legislative history of the Act itself there is a clear and repeated emphasis on the importance of local community participation. Furthermore, an examination of the affidavits and depositions filed by the plaintiff leaves no room for doubt that the purpose of WTCEO is to implement in the community which it serves the policy and goal of eliminating poverty in the Nation as expressed by Congress in the Economic Opportunity Act of 1964. In pursuing this policy Congress established the Office of Economic Opportunity in the Executive Office of the President. Central to the scheme of the Act are the provisions for community action programs. 42 U.S.C. §§ 2781–2837. The determination to be made is

whether, in choosing to fight this sector of the "war on poverty" by utilizing community action agencies rather than acting directly through OEO at the local level, Congress intended for these community organizations to be "Federal agencies" within the definition contained in the Tort Claims Act.

Several sections of the Economic Opportunity Act must be examined. With respect to community action governing boards, 42 U.S.C. § 2791(e) provides:

> (e) The powers of every community action agency governing board shall include the power to appoint persons to senior staff positions, to determine major personnel, fiscal, and program policies, to approve overall program plans and priorities, and to assure compliance with conditions of and approve proposals for financial assistance under this subchapter.

Section 2795 deals with the powers of the agencies themselves, in part as follows:

> (a) In order to carry out its overall responsibility for planning, coordinating, evaluating, and administering a community action program, a community action agency must have authority under its charter or applicable law to receive and administer funds under this subchapter, funds and contributions from private or local public sources which may be used in support of a community action program, and funds under any Federal or State assistance program pursuant to which a public or private nonprofit agency (as the case may be) organized in accordance with this part could act as grantee, contractor, or sponsor of projects appropriate for inclusion in a community action program. A community action agency must also be empowered to transfer funds so received, and to delegate powers to other agencies, subject to the powers of its governing board and its overall program responsibilities. This power to transfer funds and delegate powers must include the power to make transfers and delegations covering component

projects in all cases where this will contribute to efficiency and effectiveness or otherwise further program objectives.

The Act also sets administrative standards for operation of community action agencies and requires them to adopt "rules designed to establish specific standards" relating to employee pay and benefits and promotion procedures, the avoidance of conflicts of interest and appropriate advocacy on behalf of the poor without participation in picketing, protest or violation of law. 42 U.S.C. § 2796(a). The provisions for financial assistance from OEO to community action agencies are found in Section 2808, which provides in sub-section (e) that—

(e) In order to promote local responsibility and initiative, the Director shall not establish binding national priorities on funds authorized by this section, but he shall review each application for financial assistance on its merits. Before extending financial assistance to a new community action agency under this section, and in determining the amount of and conditions on which such assistance shall be extended, the Director shall consider the extent and nature of poverty in the community and the probable capacity of the agency to carry out an effective program. In reviewing or supplementing financial assistance to a previously existing community action agency, he shall consider the progress made in carrying on programs by such agency.

The relationship between OEO and WTCEO meets a number of the criteria for establishing that WTCEO is an independent contractor. There was no showing that OEO controlled or supervised the physical performance of the work of employees of WTCEO and Westlawn. Moreover, the requirements imposed on these local agencies by statute and regulations are not concerned with the details of the day-to-day operations of the agencies or the programs which they carry on in the Warren-Trumbull County area. They are more in the nature of general instructions to be followed in order to assure that certain policies which Congress had adopted in establishing OEO are respected and adhered to. On the other hand, by withholding approval of its operations, OEO had for all intents and purposes put WTCEO out of business for a period of time and had in October 1972 selected a new chairman of its board who completely reorganized the agency. These are not powers usually possessed by a principal in dealing with an independent contractor.

The plaintiff argues that the court should not decide the issue on potentialities, but on actuality. He maintains it is irrelevant that WTCEO might have obtained funds from other sources and might have carried on programs other than those planned by OEO. The fact is, he contends, that WTCEO never had any funds except those from the federal treasury which were granted to it by OEO and never initiated a single program other than the "canned" ones offered to it by OEO. The facts of the actual history of the operation of WTCEO, including the incident which demonstrated that OEO possessed the power to dictate to its governing board, lead to the conclusion, he maintains, that WTCEO was a corporation primarily acting as an instrumentality or agency of the United States, and therefore a "Federal agency" as defined in 28 U.S.C. § 2671.

In two cases involving the rights of employees of community action agencies similar to WTCEO, the Fifth Circuit has held that such employees were employees of a private corporation and not of the government. Robles v. El Paso Community Action Agency, Project Bravo, Inc., 456 F.2d 189 (5th Cir. 1972); Hines v. Cenla Community Action Committee, Inc., 474 F.2d 1052 (5th Cir. 1973). Though neither of these cases arose under the Federal Torts Claims Act and the agency-contractor dichotomy was not present, decision in both was based on a finding that the plaintiffs were not public employees. In his dissent in the *Cenla* case, Judge Wisdom pointed to some of the controls which

OEO retained in its dealings with the local agency in the following language:

As appears from the complaint, Cenla was organized for the purpose of qualifying as a grantee community action agency of the OEO under 42 U.S.C. § 2781. Congress adopted the Equal Opportunity Act to combat poverty, to create jobs, to disburse money for the reduction or elimination of poverty, all on a national scale. To insure federal supervision and uniformity, OEO divided the country into regions and adopted guidelines. Cenla, for example, is directly responsible to Region VI of OEO in Dallas, Texas. It must comply with the guidelines and policies formulated by Region VI in Dallas. In the event of any conflict between the policies and practices of Cenla with those of Region VI or federal legislation (as interpreted by OEO), Cenla must yield. *Id.* at 1059.

We do not believe that the community action agencies created in response to passage of the Economic Opportunity Act of 1964 fit the traditional definition of independent contractors insofar as their relations with agency clients are concerned. They have ties to the OEO which do not normally exist between a principal and an independent contractor. While many of the traditional criteria of independence are present, the power in the principal to remove the governing board of the other contracting party and replace it with one of its own choosing is totally inconsistent with the status of independent contractor. Furthermore, even a cursory reading of the voluminous regulations of OEO leaves one with the distinct impression that an organization required to operate in compliance with these "guidelines" must indeed be a federal instrumentality. The controls which are retained apply particularly to relations between the local agencies and their clients who are the beneficiaries of the 1964 Act.

Congress could have chosen to administer the Economic Opportunity Act directly by establishing local offices of OEO. The declared reason for using local agencies is to assure the maximum participation of the citizens most affected by the program in each community, to the end that the particular needs of each participating community will be discovered and dealt with. Thus, a national priority in programs is forbidden. Nevertheless, OEO approval is required for each local program and all the operations of community action agencies must fit within the detailed framework ordained by OEO.

Both the Federal Tort Claims Act and the Economic Opportunity Act of 1964 were designed to remedy conditions which caused hardship and human suffering. Before the passage of the Tort Claims Act, a person injured as the result of negligence of an employee of the government was denied a remedy which was available to another whose injuries were caused under similar circumstances by the negligence of a private individual or the employee of a private firm. Elimination of this disparity which was based on the outmoded legal fiction that "the king can do no wrong" achieved a laudable humanitarian result. Congress embarked on another humanitarian effort of monumental proportions when it undertook, with the passage of the 1964 Act, a program for the eventual elimination of poverty in this Nation.

When the two Acts here involved are read together and consideration is given to the purpose of each, it does not appear that Congress intended to shield the government from liability in a situation such as this case presents. The scheme of the 1964 Act is to improve the lot of the poor by involving them in a multitude of activities which their poverty had previously prevented them from experiencing. To the extent that participation in these activities exposes the beneficiaries of the Act to injury while engaged in approved programs under the supervision of personnel of a community action agency, the United States cannot avoid liability under the Federal Tort Claims Act on the ground that agencies chosen to achieve the purposes of the 1964 Act are not federal agencies or in-

strumentalities. To equate the status of such an agency with that of independent contractor under these circumstances would be to elevate form above substance.

It should be noted that this case does not present the issue of whether a member of the general public may base a Tort Claims Act proceeding on alleged negligence of an employee of a community action agency. Decision in such a case might well be reached by resort to the traditional tests of the principal-contractor/employee relationship unaffected by the special considerations which flow from the peculiar federal responsibility for the safety and well-being of persons drawn into the programs of OEO. Nor do we intimate any opinion on the merits of the present case.

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.