**FOUR STAR AVIATION, INC.,**
Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 26339.

United States Court of Appeals
Fifth Circuit

April 7, 1969.

Rehearing Denied May 2, 1969.

Royall P. Terry, Jr., Terry, McKee & Stephens, John Robert Terry, Miami, Fla., for appellant.

William A. Meadows, U. S. Atty., Miami, Fla., Norman Knopf, John C. Eldridge, Attys., Dept. of Justice, Washington, D. C., Edwin L. Weisl, Jr., Asst. Atty. Gen., for appellee.

Before PHILLIPS*, BELL and MORGAN, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge:

Four Star Aviation, Inc.,[1] a Florida corporation, brought this action against the United States under the Federal Tort Claims Act[2] to recover the value of a C–46R airplane.

On July 7, 1964, A & H Aircraft Parts, Inc.,[3] the then owner of the airplane, sold it to Transportes Aereos Nacionales C.A.,[4] a Venezuelan airline. A & H had theretofore executed a mortgage to the corporation from which it purchased the airplane to secure a balance of the purchase price, payable in monthly installments, aggregating $70,000, and evidenced by promissory notes. A & H executed such mortgage in Florida at a time when the airplane was located in Florida. As a part of the consideration for the notes, TANCA agreed to assume the mortgage and pay the unpaid notes secured thereby. It also endorsed the notes.[5]

In August 1964, TANCA flew the airplane to Venezuela. After having paid four of the notes it had assumed and agreed to pay, TANCA failed to pay the notes that matured after September 1964, either when due or at all.

In October 1965, Four Star became the owner of the unpaid notes and the chattel mortgage. The defaults of TANCA had not been cured, and in March 1966, two pilots, acting for and under the direction of Four Star, went to Venezuela, took possession of the airplane, and flew it to San Juan, Puerto Rico.[6]

\* Of the Tenth Circuit, sitting by designation.

1. Hereinafter called Four Star.

2. 28 U.S.C.A. §§ 2671–2680.

3. Hereinafter called A & H.

4. Hereinafter called TANCA.

5. The chattel mortgage was duly recorded with the Aircraft Registration Branch, Federal Aviation Agency, Oklahoma City, Oklahoma, April 21, 1967; with the Clerk of the Circuit Court, Dade County, Florida, May 27, 1964, and with the Directorship of Civil Aeronautics, Ministry of Communications, Republic of Venezuela, September 24, 1964.

6. The validity of the provisions of a chattel mortgage and the rights of the mortgagee thereunder are determined by the law of the place where the mortgage property was located at the time the mortgage was executed by the mortgagor. Underwood v. Phillips Petroleum Co., 10 Cir., 155 F.2d 372, 374; In re Bankruptcy of Duncan, 9 Cir., 264 F.2d 460, 463; Restatement, Conflict of Laws, § 265 (1934); Restatement (Second), Conflict of Laws, § 191 (Proposed Official Draft, May 1966).

Under the law of Florida, a chattel mortgage gives the mortgagee only an equitable lien, not the legal title or the right of possession, F.S.A. §§ 697.01, 697.-02, and the mortgagee may acquire the right of possession of a mortgaged chattel on default of payment of the indebtedness secured thereby only by judicial foreclosure and purchase at the foreclosure sale. J. G. White Engineering Corp. v.

While the airplane was in flight from Venezuela to San Juan, Interpol police notified Puerto Rican authorities at San Juan that the airplane had been stolen. When it arrived at San Juan, Puerto Rican police assigned to the airport took possession of the airplane and retained custody of it from Wednesday, March 30, 1966, when it landed, until the afternoon of April 2, 1966, when they released it to Venezuelan authorities.

Federico Bauzo was Chief of Aviation of the Puerto Rico Ports Authority, which had jurisdiction over the San Juan Airport and other Puerto Rican airports. On March 31, 1966, Bauzo was notified that an airplane was at the San Juan Airport and that Interpol had reported it to have been stolen. On April 1, 1966, he contacted the Federal Aviation Agency and was advised by it that the Government of Venezuela was asserting a claim to the airplane and that the Federal Aviation Agency had no jurisdiction in the matter.

On April 1, 1966, Bauzo telephoned Carlos J. Lastra, Secretary of State of Puerto Rico, and explained to him that some person in Miami and the Venezuelan Government were both claiming the right to possession of the airplane. Lastra advised Bauzo to wait for further instructions before acting in the matter. Secretary Lastra already had been advised by a letter dated April 1, 1966, from the Consul General of Venezuela in Puerto Rico that an airplane belonging to TANCA had been illegally flown to Puerto Rico. The letter requested the cooperation of Lastra in facilitating the return of the airplane to Venezuela. On receipt of that letter, Secretary Lastra

communicated by telephone with C. Allan Stewart, head of the Office of Caribbean Affairs in the United States Department of State, in an effort to ascertain the viewpoint of the Department of State with regard to the request of the Venezuelan Government.

Before responding to Lastra's inquiry, Stewart consulted the Director of the Office of Colombian and Venezuelan Affairs in the United States Department of State. The Department of State had already received a telegram dated March 31, 1966, from the Venezuelan Embassy, notifying such Department that an airplane owned by TANCA had been stolen from an airport in Venezuela by nationals of the United States and flown by them to Puerto Rico. The Director of the Office of Colombian and Venezuelan Affairs also had been informed by the Federal Aviation Agency that it had no official interest in the status of the airplane and no reason to request its detention.

After discussing the matter with the Director of the Office of Colombian and Venezuelan Affairs, Stewart determined that as far as the interest of the United States was concerned, there was no reason to bar the return of the airplane to Venezuela. Accordingly, Stewart telephoned Lastra and stated, "As far as the Department of State was concerned there was no objection to it (the airplane) being returned to the Venezuelan government." The court in effect found that such was Stewart's statement to Lastra.

Lastra testified that Stewart informed him that the Venezuelan Government had perfect "rights" to claim the airplane and that he (Lastra) should instruct the

---

People's State Bank, 81 Fla. 35, 87 So. 753, 756; Louisville & N.R. Co. v. Wang, 61 Fla. 299, 55 So. 73, 75.

Under the law of Florida, a provision in a chattel mortgage on property located in Florida when made, undertaking to give the mortgagee the right, on default by the mortgagor in payment of the debt secured by the mortgage, to take possession of and sell the mortgage property is void. Fincher Motors, Inc. v. Northwestern Bank & Trust Co., Fla.App.1964, 166

So.2d 717, 719; Snow v. Nowlin, 125 Fla. 166, 169 So. 598, 599.

That is also the law of Venezuela. Codigo Civil De Venezuela. 3. ed. Caracas, Ediciones Legis, 1965 (Civil Code of Venezuela, Art. 1878). In Venezuela, foreclosure of a chattel mortgage on default may be effected only by judicial proceedings. Codigo De Procedimiento Civil De Venezuela. 3. ed. Caracas, 1962 (Code of Civil Procedure, Arts. 533–537).

"people" at the airport to ask the Consul to send two pilots to take charge of the airplane. But the trial court, after hearing a motion to reconsider his findings, adhered to his former findings and expressly found that Stewart gave Lastra no specific instructions.

Stewart testified at the trial as a witness for the United States. He had also given a deposition. Lastra's testimony was by deposition. The trial court had an opportunity to observe Stewart's demeanor while testifying and to judge his credibility.

It is significant that Lastra admitted he did not instruct Bauzo to release the airplane to Venezuelan representatives. He said he merely repeated to Bauzo what Stewart had said to him and left Bauzo free to decide to whom he should release the airplane.

Bauzo testified that Lastra instructed him to release the airplane to two Venezuelan pilots, who were arriving on the Iberian flight that night, and that he (Bauzo) instructed the Operations Superintendent of the San Juan Airport so to do.

We conclude that the trial court's finding as to what Stewart stated to Lastra is supported by substantial evidence and is not clearly erroneous, and is therefore binding on this court.[7]

We think Stewart's statement to Lastra fell far short of being either a direction or advice as to what action he should take with respect to releasing the airplane; that it left the Puerto Rican authorities free to decide what action they should take with respect to releasing the airplane, and merely advised Lastra that there would be no objection by the United States Department of State to the Puerto Rican authorities releasing the airplane to Venezuela, should they decide so to do.

We conclude that Stewart's statement to Lastra was not a "negligent or wrongful act or omission" within the meaning of that phrase, as used in the Federal Tort Claims Act.

Counsel for Four Star assert that even if Stewart's statement to Lastra was in the language testified to by Stewart, coming as it did from an official of the United States Department of State to an official of the Commonwealth of Puerto Rico, it amounted to a direction to Puerto Rican authorities to release the airplane to Venezuelan representatives. Assuming, but not conceding the correctness of that assertion, then Stewart's action would have amounted to a decision by an official of the United States Department of State that as a matter of international relations between the United States and Venezuela the airplane should be released to Venezuela. Such decision would have involved the exercise of judgment and discretion with respect to a matter involving our international relations and affecting our foreign policy, and the Federal Tort Claims Act would not have applied thereto.[8]

Counsel for Four Star apparently take the position that it was a proper function of Stewart, as an official of the Department of State, to advise the Puerto Rican authorities with respect to which of the two contending private parties, Four Star and TANCA, under applicable local law, was entitled to the possession of the airplane. We disagree and hold it was not a proper official function of Stewart to give such legal advice, and that he did not undertake so to do.

Puerto Rican authorities were investigating the facts with a view to determining which of the parties asserting a right to possession of the airplane was legally entitled to possession thereof, but before they arrived at a conclusion, Bauzo released the airplane to the Venezuelan pilots.

Accordingly, the judgment is affirmed.

7. Fed.Rules Civ.Proc. rule 52(a), 28 U.S. C.A.

8. 28 U.S.C.A. § 2680(a);
   Dalehite v. United States, 346 U.S. 15, 36, 73 S.Ct. 956, 97 L.Ed.2d 1427; United States v. Faneca, 5 Cir., 332 F.2d 872, 874.