J. A. McMICHAEL, Adm. of the Estate of Emma McMichael, Plaintiff,

v.

UNITED STATES of America, Defendant.

Mrs. Lamar BARTLETT, Mrs. Thelma Lowe, Mrs. Edna Rogers, Mrs. Flora Weaver and Mrs. Georgia Ray, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Leonard MADISON, Adm. of the Estate of Lula Mae Madison, Plaintiff,

v.

UNITED STATES of America, Defendant.

Oscar WALKER, Adm. of the Estate of Eliza Walker, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Willie MOODY, Adm. of the Estate of Geraldine Moody, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Willie E. KELLY, Adm. of the Estate of Shirley J. Kelly, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Billy HARRISON, Adm. of the Estate of Elsie Marie Harrison, Plaintiff,

v.

UNITED STATES of America, Defendant.

Georgia RAY, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. 77–1006, 77–1008, 77–1031 to 77–1034, 78–1006 and 78–1015.

United States District Court, W. D. Arkansas, El Dorado Division.

Sept. 2, 1981.

Phillip H. McMath, McMath & Leatherman, Little Rock, Ark., for plaintiffs in Nos. 77–1006, 77–1008, 78–1006, 78–1015.

Bernard Whetstone, Little Rock, Ark., for plaintiffs in Nos. 77–1031, 77–1032, 77–1033, 77–1034.

Larry McCord, U.S. Atty., and Floyd Clardy, Asst. U.S. Atty., Fort Smith, Ark., for defendant.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

These consolidated cases were filed individually by complaint against the United States of America under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671–2678, 2680. The plaintiffs seek damages against the United States of America for injuries and deaths caused by an explosion near Camden, Arkansas on March 8, 1976. The explosion occurred at a plant where Celesco Industries, Inc., (Celesco) an Independent Contractor, was in the process of producing a certain type of ammunition pursuant to a contract with the United States of America.

As a result of the explosion, seven employees of Celesco Industries, Inc., were fatally injured. Six are represented in these actions by administrators of their estates. Five other employees of Celesco were seriously injured. The plaintiffs allege negligent acts on the part of the U.S.A. in their complaints. The alleged negligent acts are enumerated in the complaints.

The defendant government has filed a Motion for Summary Judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. The government contends that there is no material issue of fact and, therefore, is entitled to judgment as a matter of law. Counsel for the parties have filed briefs with voluminous records and the motion is submitted for the Court's determination.

In submitting the motion for the Court's consideration, the parties have filed a stipulation for the purpose of forming a basis for the Court's ruling on the Motion for Summary Judgment. This stipulation, which includes facts only for the purpose of the Court's ruling on the summary judgment motion, states:

That at the time of the injuries in question, Celesco, Inc., was operating the munitions plant in question under contract with the Department of Defense. Its relationship with the Department of Defense was that of an independent contractor. The product being produced was a photo-flash cartridge which is potentially explosive. The activity was one which would generally be recognized as being inherently dangerous or ultra-hazardous. Because of the volatile nature of the product, special skill and special facilities are required to manufacture the cartridges in an acceptable and safe manner. Additionally, there are generally recognized procedures and precautions which should be utilized in the manufacturing process.

It is further stipulated that Celesco did not have the requisite skills; that the facilities in question were inadequate; and that the generally recognized procedures were not followed; that the Government was aware, or could have learned of the various inadequacies mentioned above through its pre-award survey, its three on-sight quality assurance inspectors who were present throughout the operation, and through periodic spot-check inspections.

Lastly, it is stipulated that the contract with Celesco contained numerous safety regulations and requirements which the contract required Celesco to comply with; that the requirements were inadequate in some respects, and that they were not enforced by the Department of the Defense.

The question of proximate cause between any failure above mentioned and the injuries is assumed to be satisfied.

From the items included in the stipulation and the circumstances as recorded in the numerous complaints, it is apparent the tragic explosion should never have occurred. The record is replete with evidence of callous and gross negligence on the part of Celesco and the United States through its

employees and agents. The negligence is of such proportions as to be almost beyond description.

As included in the stipulation, the government, through the Department of Defense (DOD), had a contract with Celesco for the production of Photo-Flash cartridges. These cartridges are not only potentially explosive, but recognized as being inherently dangerous or ultra-hazardous.

The government admits that it knew Celesco did not have the requisite skills; that the facilities of the munitions plant in question were inadequate; and that the government was aware, or should have learned, of the various inadequacies had the on-site inspectors who were present throughout the operation performed their duties.

The thrust of the motion for summary judgment is that regardless of the failure of the defendant's inspectors to perform responsibly in the course of their duties, the United States of America is exempt from liability under the FTCA for the damages caused by the tragic incident involved in these actions.

Prior to the passage of the Federal Tort Claims Act in 1946 by the Seventy-Ninth Congress, any claim against the United States of America had to be made through private legislation approved by the Congress with the concurrence by the President. Each Congress considered private bills for people who had suffered injuries or death due to acts of employees of the United States of America. This Court has personal knowledge of the frustrations, inadequacies and injustices which resulted. After almost thirty years of Congressional consideration, the FTCA was adopted as Title IV of the Legislative Reorganization Act, 60 Stat. 842. By this action, the District Courts were given jurisdiction over acts of negligence or misfeasance of government employees during the course of their employment. Liability, with an ensuing obligation to pay damages, could be found. This liability, however, was subject to certain exceptions.

Subject to the provisions of Chapter 171 of Title 28 (28 U.S.C. § 2680), the District Courts ". . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after July 1, 1945, for injury or loss of property, or personal injury or death, caused by the negligent or wrongful act or omission of any employee of the government under circumstances where the United States, as a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Section 1346(b).

The exception (28 U.S.C. § 2680) provides:

The provisions of this chapter and section 1346(b) shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or *based upon the exercise or performance or the failure to exercise or perform a discretionary function* or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.[1] (Emphasis supplied.)

As a part of the U.S.A. arsenals authorized in World War II, the government developed an ammunition depot at Shumaker, Ouachita County, Arkansas. The depot, comprised of approximately 68,000 acres, originally produced and packaged ammunition used by the United States and allies in World War II. Also, substantial tests of long and short range firings were conducted at the depot. Numerous buildings, located on the project, were used for several purposes, including storage of ammunition.

Some time after the conclusion of World War II and the Korean War, the government disposed of the project. Most of the project was turned over for development by private industry. A substantial part of the building complexes remained and were transferred to privately owned, controlled and operated enterprises.

1. The legislative history of the FTCA is given in some detail in the case of *Dalehite, et al. v.*

*United States,* 346 U.S. 15, 24–30, 73 S.Ct. 956, 962–965, 97 L.Ed. 1427 (1953).

Through the years a substantial part of the properties, including buildings, were utilized by private industry to perform contracts with the United States. Some of the contracts were for substantial production for the DOD as a part of the government's military operation.

One of the buildings utilized was known as M–35–B. Building M–35, as used by Celesco, was the site of the explosion involved in this litigation. It is part of the Highland Park Industrial Area, East Camden, Arkansas. The Highland Park Industrial Area is that part of the ammunition depot at Shumaker Naval project that was disposed of by the government via sale or contract to a private entity, Highland Resources, Inc., Houston, Texas, for industrial development and to be utilized by private industry. Highland Resources, Inc., is a Texas corporation that became the owner of the area, including land, buildings, and other properties. Highland Resources, by lease agreement as owner and lessor of the property, leased the building to Celesco Industries, Inc., for the purpose of producing the Photo-Flash cartridge under its contract with the government as herein described. The building leased by Highland Resources, Inc., for the purposes stated includes, but is not limited to, building M–35 where the explosion took place that caused the injuries to the employees of Celesco Industries, Inc.[2]

The record disclosed that the Defendant, United States Government, had an arrangement or commitment with the West German government to produce and supply a certain type of ammunition or explosive referred to as Photo-Flash Cartridge M123A1. It appears that the request for the Military Procurement originated in the latter part of 1974 when the Chief, Product Management, Procurement Directorate, requested action be taken to procure 38,700 each Photo-Flash Cartridges. Picatenny Arsenal was apparently chosen to be the contracting office for procurement. The applicable technical data package to be used was TDP–PH–P–30–67, revision aa, dated October 18, 1974. Procurement, to be on a competitive basis, sought a firm fixed price contract. Celesco Industries was among the suggested suppliers.

The proposed procurement plan was prepared by the Procurement Directorate, Commodity Procurement Division. A solicitation package was developed and formally advertised in accordance with the provisions of the Armed Services Procurement Regulations. The initial number of firms solicited was eleven, seven large and four small businesses. The total number of firms to which the package was sent reached fourteen. By letter dated December 18, 1974, the Acting Chief of the Commodity Procurement Branch requested a synopsis of the procurement be placed in the Commerce Business Daily.

The formally advertised solicitation which was ultimately published was an amount of 50,700 units each. The technical data package, as well as major components safety data statements covering all components of the M123A1, was included as a part of each solicitation package. The solicitation consisted of these line items, i. e., the first article sample and two production quantities.

It should be noted that the technical data package used was not new. It had previously been used for quantity production purchases, and its safe productibility was believed to have been well established. The government had, without incident, procured this item for many years from Pace Corporation, Memphis, Tennessee. Celesco Industries was successor in interest to the Pace Corporation. Tooling and production know-how acquired by Pace had been transferred to Celesco. This undisputed fact allowed Celesco to be the sole company to respond to the solicitation of the government for the procurement of the cartridge M123A1.

Although the solicitation reached fourteen businesses, eleven having been solicited, Celesco Industries, Inc., was the only

---

**2.** A number of the plaintiffs in these consolidated cases have pending four separate complaints, Nos. 79–1016, 79–1017, 79–1018, and 79–1019, against Highland Resources, Inc., in which they are claiming damages against Highland Resources, Inc., for alleged negligence which proximately resulted in the injuries caused by the explosion.

one to submit a bid. Celesco's bid on the contract to produce the Photo-Flash Cartridge represented a total dollar amount of $900,957.00.

It is further disclosed that the bid of Celesco was subject to evaluation to determine if Celesco possessed the necessary technical and production capabilities to perform the contract. Furthermore, a safety survey was performed by the government through the Defense Contracted Administration Services Regional (DCASR) Officer at Dallas. (This is an entity within the Department of Defense to administer military procurement contracts.) Notwithstanding the stipulation referred to hereinabove, the pre-award survey of Celesco inferred that the company could comply with the details of the contract. Among other factors evaluated were safety, building, and other facilities. However, the testimony before the Picatenny Arsenal Board of Inquiry indicated that the officer who made the survey only visited the Celesco Plant in East Camden, Arkansas periodically and did not visit the plant in the course of the pre-award survey.

On the basis of the various recommendations, an award was made for a total quantity of 36,000 each for the M123A1 Photo-Flash Cartridge. The award of the contract was approved on June 20, 1975, Number DAAA–21–75–C–0241. The delivery schedule established in the contract called for the first article sample line item to have a delivery date of September 25, 1975. The final delivery, consisting of 6000 units, was to be made on or before May 26, 1976. The contract between Celesco and the government incorporated, inter alia, the relevant safety clauses as required by the Armed Services Procurement Regulations ASPR 7.104–78 and 7.104–79. These provisions are detailed under identical section numbers in Title 32 of the Code of Federal Regulations. Pertinent provisions are set forth in 32 C.F.R. 7.104–79, entitled: "Safety precautions for ammunition, explosives, other dangerous materials, and materials hazardous to health."

The above cited safety precaution was required to be included in the contract. It outlined the responsibility of the contractor as required by the DOD Contractor's Safety Manual for ammunition, explosives and related dangerous materials. (DOD Manual 414.26M) in effect at the time. In Paragraph (d) it is provided that:

> Neither the requirements to this clause nor any act or failure to act by the government in surveillance or enforcement thereof shall effect or relieve the contractor of responsibility for the safety of his personnel and property and for the safety of the general public in connection with performance of this contract, or impose or add to any liability of the government for such safety. . . .

With these provisions incorporated in the contract, the contractor was informed of the hazardous nature of the work. Furthermore, the responsibility for the safety of the plaintiffs while performing the contract was placed on Celesco and not upon the United States government.

In a manner of recapping the administrative history of the contract involved in this litigious proceeding, there was first an arrangement worked out by the appropriate department of the United States government with the West German government for the procurement of the Photo-Flash Cartridge. This involved a chain of command originating with the service Department of the Army (DA), down through the chain to Army Material Command (AMC), then to Munitions Company (MUCOM), then to Army Procurement Supply Agency (APSA) and finally to Picatenny Arsenal.

### THE INCIDENT RESULTING IN THESE CONSOLIDATED LAWSUITS

On March 8, 1976, the workforce at the Celesco Plant reported for duty at the usual starting hour. The employees of Celesco reported directly to Building M–35 where the M123A1 Photo-Flash Cartridge assembly line was in operation. It is suggested that the line was operating on a one shift basis. The contractor determined this to be sufficient to meet required delivery schedules. There was a heavy overcast, with rain. Some of the witnesses reported that they saw lightning at a distance, and there was thunder. Although there was thunder-

storm activity, the operations in Building M–35 were not shut down that morning. There were reports that supervisory personnel did not think the storms were close enough to require shutting down the operation. Nevertheless, the record of testimony presents conflicting statements as to the exact nature of the weather that morning. It is revealed, however, that after the incident, the contractor was cited by the United States Department of Labor, Occupational Safety and Health Administration, for failure to maintain a written safety procedure for shutting down operations in case of adverse weather conditions.

At approximately 11:30 a. m., the shift at Building M–35 took a lunch break. It was for a period of about one-half hour. At shortly before noon, the DCASR Resident Inspector (COR) conducted a count of the number of completed units and other units in the course of production which were being stored in Bay 4 of Building M–35. Bay 4 was a specifically and specially constructed room consisting of heavy concrete, sand-filled walls with a blow-out roof, blow-out wall, and steel barrier doors to minimize the effect of any explosion that might occur in that Bay.

It appears there were a total of 832 units in Bay 4. The safety plan used by Celesco indicated a safe load limit in Bay 4 of 800 units. The plan submitted by DCAS for approval prior to an award, indicated a limit of 400 units. Four hundred units was the amount which was approved. Apparently, Celesco unilaterally raised the load limit in Bay 4 to 800.

Just before the lunch hour concluded, Celesco's employees began to return to their stations. It was raining. There appears to have been a flash, though the narration of the sequence of events becomes confused. It appears there was a wall of flames where Bay 6 had been.

Shortly thereafter, Bay 4 exploded. Some of the personnel present were injured and some dazed. Shock resulted. Some

thought the bright flash was from lightning. Nevertheless, after the explosion a number of small fires continued; seven individuals were removed who were fatally injured. There were a number of other casualties with varying degrees of severity.

The explosion completely destroyed the operations of Building M–35. Celesco did not resume operations on the Photo-Flash Cartridge and became in default awaiting orders on disposition of outstanding quantities to be produced under the contract.

## APPLICABILITY OF THE FTCA, 28 U.S.C. § 1346(b)

■ It is accepted jurisprudential principle that no action lies against the United States unless authorized by Congress. *Dalehite v. United States,* 346 U.S. 15, 30, 73 S.Ct. 956, 965, 97 L.Ed. 1427 (1953). "The language of the act makes the United States liable 'respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances'. 28 U.S.C. § 2647. This statute is another example of the progressive relaxation by legislative enactment of the rigor of the immunity rule." *Dalehite,* supra, at 30, 73 S.Ct. at 965.

As stated in *United States v. Orleans,* 425 U.S. 807, 813, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1975):

The Federal Tort Claims Act is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment.... The language of 28 U.S.C. § 1346(b) is unambiguous, covering injuries 'caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment....'[3] The Act defines Government employees to include officers and employees of 'any federal agency' but excludes 'any contractor with the United States.' 28 U.S.C. § 2671.

---

**3.** As used in this chapter and §§ 1346(b) and 2401(b) of this Title, the term Federal Agency includes the executive and military departments. Independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States. 28 U.S.C. § 2671.

Since the United States can be sued only to the extent it has waived its immunity, due regard must be given to the exceptions to such waiver. *Dalehite*, supra, 346 U.S. at 30–31, 73 S.Ct. at 965. Furthermore, modifications in the act must be construed in a manner to accomplish the aim; in the instant case, construed to carry out the legislative purpose of allowing suits against the government for negligence. This must include giving due regard for the statutory exceptions to the policy. In interpreting the exceptions to the generality of the grant, courts include only those circumstances which are within the words and reason of the exceptions. *Dalehite*, supra, at 31, 73 S.Ct. at 965. *Federal Housing Administration v. Burr*, 309 U.S. 242, 251, 60 S.Ct. 488, 493, 84 L.Ed. 724 (1939).

It, therefore, follows that as stated in *Dalehite*, supra, decisions of the court have interpreted the Act (FTCA) to require clear relinquishment of sovereign immunity to give jurisdiction for tort actions.[4]

On the other hand, a reading of § 2680 in its entirety makes it obvious that the Congress exercised great care to protect the government from claims, however negligently caused, that affected governmental functions. An analysis of § 2680(a), the exception with which we are concerned, emphasizes the Congressional purpose to except the negligent acts involved here from the authorization to sue.

■ It should be noted from the form of the section that there are two phrases describing the excepted acts of government employees. First, the provisions of the section and § 1346(b) of this title should not apply to "acts and omissions of government employees exercising due care in carrying out statutes or regulations, whether valid or not." In other words, it bars tests by tort action of the legality of statutes and regulations. Secondly, it excepts acts of "discretion in the performance of governmental functions or duty .... whether or not the discretion be abused." Therefore, not only agencies of government are excepted, but all employees exercising discretion. It is clear that the just quoted clause as to abuse connotes both negligent and wrongful acts in the exercise of the discretion because the act waives immunity only for "negligent or wrongful act or omission of any employee ... within the scope of his office, where the United States, if a private person, would be liable." 28 U.S.C. § 1346(b). The exercise of discretion could not be abused without negligence or a wrongful act. *Dalehite v. United States*, supra, 346 U.S. at 33, 73 S.Ct. at 966.

The Committee Report accompanying the bill with § 2680(a) provides that the section is to preclude action for "abuse of discretionary authority ... whether or not negligence is alleged to have been involved." The report speaks of excepting a "remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion." *Dalehite v. United States*, supra, 33–34, 73 S.Ct. at 966–967.[5] It is usual procedure to refer to Committee Reports for interpretation of an act provided by Congress. In this manner, we determine what was intended.

---

4. In *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, the Supreme Court held that the Act did not waive immunity for tort actions against the United States for injuries to three members of the Armed Forces while on active duty. The injuries to those belonging to the armed services led the Court to conclude that Congress had not intended to depart from this system and allow recovery by a tort action dependent on state law. Recovery was permitted by a serviceman for nonservice disabilities in *Brooks v. United States*, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200.

In *United States v. Spelar*, 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3, the Supreme Court held that federal courts did not have jurisdiction to try a tort action for injury by a federal employ-

ee to a complainant because of an accident at an air base in Newfoundland. This conclusion was reached because of the exception, § 2680(k), of "Any claim arising in a foreign country." The sovereignty of the United States did not extend over the base.

5. See H.R.Rep.No.2245, 77th Cong., 2d Sess., p. 10; S.Rep.No.1196, 77th Cong., 2d Sess., p. 7; H.R.Rep.No.1287, 79th Cong. 1st Sess., pp. 5–6; Hearings before House Com. on Judiciary on H.R.5373 and H.R.6463, 77th Cong., 2d Sess., p. 33. The paragraph reads as follows:

"Section 402 specifies the claims which would not be covered by the bill.

"The first subsection of section 402 exempts from the bill claims based upon the perform-

■ The Court, therefore, from personal experience, knows that the draftsmen did not intend the act to relieve the government from liability for such common law torts as an automobile collision caused by the negligence of an employee of the administering agency. The Court also knows it was intended to cover more than the administration of a statute or regulation in that it appears disjunctively in the second phrase of the section. "The 'discretion' protected by the section is not that of a judge—a power to decide within the limits of positive rules of law subject to judicial review. It is the discretion of the executive or administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law." *Dalehite v. United States*, supra, at 34, 73 S.Ct. at 967.[6] The Supreme Court in *Dalehite*, characterized governmental functions as either a planning (discretionary) or operational one. No liability may be imposed upon the government for negligence which occurs at the planning stage as this is a "discretionary function" and, therefore, excepted. Liability may be imposed, however, for negligence at the operational level.

The distinction between "discretionary function" and "operational function" is made clear in one of the early decisions interpreting the FTCA in *Hopson v. U. S.*, 136 F.Supp. 804 (W.D.Ark.1956) wherein the late Honorable John E. Miller stated at page 811:

> Nor would plaintiff's claim be barred by the discretionary function exclusion contained in 28 U.S.C.A. § 2680(a). In this regard the decision of the Navy to carry on the work involved herein, and particularly to permit the construction of the de-inhibitor machines, may have involved a discretionary function. *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427. But, any negligence on the part of the employees of the Government in installing, operating or inspecting the machines, after the decision to construct them had been made, would be actionable. See, *Eastern Air Lines v. Union Trust Co.*, 95 U.S.App.D.C. 189, 221 F.2d 62, 73–78; 350 U.S. 907. [76 S.Ct. 192, 100 L.Ed. 796]

■ It is also well settled that the awarding of contracts by the government involves a "discretionary function or duty"

---

ance or nonperformance of discretional functions or duties on the part of a Federal agency or Government employee, whether or not the discretion involved be abused, and claims based upon the act or omission of a Government employee exercising due care in the execution of a statute or regulation, whether or not valid. This is a highly important exception, intended to preclude any possibility that the Bill might be construed to authorize suit for damages against the Government growing out of an authorized activity, such as a flood-control or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious, or that the statute or regulation authorizing the project was invalid. It is also designed to preclude application of the bill to a claim against a regulatory agency, such as the Federal Trade Commission or the Securities and Exchange Commission, based upon an alleged abuse of discretionary authority by an officer or employee, whether or not negligence is alleged to have been involved. To take another example, claims based upon an allegedly negligent exercise by the Treasury Department of the blacklisting or freezing powers are also

intended to be excepted. The bill is not intended to authorize a suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion. Nor is it desirable or intended that the constitutionality of legislation, or the legality of a rule or regulation should be tested through the medium of a damage suit for tort. However, the common-law torts of employees of regulatory agencies would be included within the scope of the bill to the same extent as torts of nonregulatory agencies. Thus, section 402(5) and (10), exempting claims arising from the administration of the Treasury, are not intended to exclude such common-law torts as an automobile collision caused by the negligence of an employee of the Treasury Department or other Federal agency administering those functions."

6. It seems sufficient to cite *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60; *Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780; *Alzua v. Johnson*, 231 U.S. 106, 34 S.Ct. 27, 58 L.Ed. 142; *Louisiana v. McAdoo*, 234 U.S. 627, 633, 34 S.Ct. 938, 940, 58 L.Ed. 1506; *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 131, 60 S.Ct. 869, 878, 84 L.Ed. 1108.

in the exercise of which it is exempt from liability under the Federal Tort Claims Act, 28 U.S.C. § 2680(a), and *Dalehite v. United States*, 346 U.S. 15, 42, 73 S.Ct. 956, 971, 97 L.Ed. 1427 (1953); *Gowdy v. U. S.*, 412 F.2d 525, 529 (6th Cir. 1969).

The same principle is stated in an opinion from the Second Circuit which states:

> While appellants argue that the awarding of contracts here was on an 'operational level,' as opposed to a discretionary one, *Hendry v. United States*, 418 F.2d 774, 782–83 (2d Cir. 1969), the award of Government contracts is generally held to involve the exercise of a discretionary function. See *Scanwell Laboratories, Inc. v. Thomas*, 521 F.2d 941, 948 (D.Cir.1975); *Gowdy v. United States*, 412 F.2d 525, 529 (6th Cir.), cert. denied, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969); *Lipka v. United States*, 249 F.Supp. 213 (N.D.N.Y. 1965), aff'd on other grounds, 369 F.2d 288 (2d Cir. 1966), cert. denied, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967). 'Where there is room for policy judgment and decision there is discretion,' the leading case tells us. *Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953). See also, H.R.Rep. No.1287, 79th Cong. 1st Sess. (1945) . . . . That a mistaken assumption of the facts was relied upon in the Postal Service choice of contractor here does not make the choice any the less discretionary. While the legislative history of 39 U.S.C. § 5005(a)(4), (b)(2), indicates that the statute was enacted to give star route contractors a measure of security, see note 2 supra, the language is precatory only; it does not call for automatic renewal in disregard of all other considerations.

*Myers & Myers, Inc. v. United States Postal Service*, 527 F.2d 1252, 1256–57 (2d Cir. 1975).

With reference to the question of the admission of the government as to negligence or abuse of discretion, *Myers* held:

> We view the complaint as stating that the Postal Service has abused its discretion and has acted arbitrarily and with insufficient and erroneous evidence in its contract renewal actions. Thus viewed, the action complained of still falls within the § 2680(a) exception from jurisdiction where negligence in the performance of a discretionary function is alleged. *Scanwell Laboratories, Inc. v. Thomas*, supra; *Coastwise Packet Co. v. United States*, 398 F.2d 77 (1st Cir.), cert. denied, 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274 (1968) . . . .

Finally, the Fifth Circuit considered the issue of "discretionary function" involving our government through the State Department on an alleged negligent or wrongful act or omission with the Federal Tort Claims Act. *Four Star Aviation, Inc. v. United States*, 409 F.2d 292, 295 (1969). The case involved a statement by an official of the United States Department of State to an official of the Commonwealth of Puerto Rico which, as contended, amounted to a direction to Puerto Rican authorities to release an airplane to Venezuelan representatives. If true the action would have amounted to a decision by an official of the United States Department of State that as a matter of international relations between the United States and Venezuela the airplane should have been released to Venezuela. The court said:

> Such decision would have involved the exercise of judgment and discretion with respect to a matter involving our international relations and affecting our foreign policy, and the Federal Tort Claims Act would not have applied thereto.

28 U.S.C. § 2680(a); *Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427, 1440.

A similar hands off policy obtains in the area of awarding government contracts, for even though the lowest bidder that complies with bid requirements may have a prima facie claim on the contract, discretion in enforcing or waiving certain requirements and balancing policy factors may change the result and at the same time insulate that result from tort liability. See, e. g., *Myers & Myers, Inc. v. United States Postal Serv.*, 527 F.2d 1252 (2d Cir. 1975); *Scanwell Laboratories, Inc. v. Thomas*, 172 U.S. App.D.C. 281, 521 F.2d 941 (1975), cert. denied, 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976); *Gowdy v. United States*, 412

F.2d 525 (6th Cir.), cert. denied, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969); *Lipka v. United States,* 249 F.Supp. 213 (N.D.N.Y.1965), aff'd on other grounds, 369 F.2d 288 (2d Cir. 1966), cert. denied, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967).

The Court has had the benefit of excellent briefs submitted by counsel for the parties and has carefully analyzed the arguments on behalf of both the plaintiffs and the defendant. A great many cases of court interpretation as to the application of the FTCA, 28 U.S.C. §§ 1346(b), 2671–2678, 2680, have been cited by the attorneys, many of which the Court has analyzed and considered. The cases of record wherein the courts have interpreted the Act and applied it to various and sundry circumstances are legion.

As an example, included with the great number of cases cited to the Court are *Alexander v. U. S.,* 605 F.2d 828 (5th Cir. 1979), *U. S. v. Babbs,* 483 F.2d 308 (9th Cir. 1973), and *Thorne v. U. S.,* 479 F.2d 804 (9th Cir. 1973). However, these and other cited cases do not reach the issue of the applicability of the FTCA in these cases. The cited cases were not involved with the exceptions included in the Act by the Congress which excluded liability for acts involving "discretionary function." The Court does not have any quarrel with the decisions cited as applicable to those particular cases. The thrust of the cases referred to does not involve the issue of "discretionary function" but rather alleged negligence on the part of the United States.

By way of further example, counsel for the plaintiffs place substantial reliance on the lack of compliance with the government's DOD manuel on safety. This, however, will not result in liability being imposed upon the government, if enforcement was a discretionary function.

In a decision by the United States District Court, Northern District of Florida, dated November 21, 1978, *Wyatt v. United States,* PCA–No. 78–0417 (apparently unpublished), the court stated that the law appears settled that employees of independent contractors cannot recover from the government under the FTCA on the basis of contractual obligations requiring various safety measures and the presence of government safety inspectors in the area. *Zabala Clemente v. U. S.,* 567 F.2d 1140, 1149 (1st Cir. 1978), and the cases cited therein. Reservation by the United States of the right of inspection or actual inspection, without more, does not subject the government to liability. *Jeffries v. U. S.,* 477 F.2d 52, 56 (9th Cir. 1973). The United States may not be held liable because it retains the right, and actually undertakes to require, adherence to safety regulations. *Fisher v. U. S.,* 441 F.2d 1288, 1292 (3rd Cir. 1971), and cases cited therein. Issuance of regulations and a manual relating to a safety program will not render the government liable. *Market Insurance Co. v. U. S.,* 415 F.2d 459, 463 (5th Cir. 1969).

This Court has previously considered the issue involved. In the consolidated cases of *Martin, et al. v. U. S.,* the Court held in an opinion issued November 29, 1977, that the government was liable due to negligence of its employees in an aircraft accident for the death of four prominent individuals and therein distinguished the liability due to negligence as against the issue of discretionary function. Judgment against the government was awarded in substantial sums. 448 F.Supp. 855 (D.C.), on appeal 586 F.2d 1206 (8 Cir. 1978), aff'd but remand for redetermination of work life expectancy for Arthur J. Allison.

In a more recent case, *Dunavant v. United States,* 520 F.Supp. 39 (E.D.Ark.1981), this Court determined that in Section 3 of the Flood Control Act of 1928 the Congress specifically excepted the government from liability for damages from flood control waters. Furthermore, this Act was not repealed by the FTCA. The Court never reached the question of discretionary function because, again, the Congress limited governmental liability of negligence.

The Court concludes that the Congress intended by the specific language included in the exception limiting jurisdiction, 28 U.S.C. § 2680, that the government is not to be held liable on such claims as called for in these consolidated cases.

On the delicate and sensitive issue of waiver of immunity and transferring the burden of examining tort claims to the courts, Mr. Justice Jackson, in writing for the court in *Feres v. U. S.*, 340 U.S. 135, 140, 71 S.Ct. 153, 156, 95 L.Ed. 152, articulated that the primary purpose of the Act was to extend a remedy to those who had been without. He stated that looking to the detail of the Act, broadly speaking the District Court "shall have exclusive jurisdiction of civil actions on claims against the United States for money damages."

Further, the Justice declared:

Jurisdiction is necessary to deny a claim on its merits as matter of law as much as to adjudge the liability exists. We interpret this language to mean all it says, but no more. Jurisdiction of the defendant (*U.S.A.*) now exists where the defendant was immune from suit before; it remains for courts, in exercise of their jurisdiction, to determine whether any claim is recognizable in law.

*Feres*, supra, at 141, 71 S.Ct. at 156.

The Court further stated that the Act confers jurisdiction to render judgment upon all such claims. "But it does not say that all claims must be allowed." In denying claims of servicemen, the court held that the effect of the FTCA is to waive immunity from recognized causes of action and not to visit the government with novel and unprecedented liabilities. It did not waive immunity, said the court, for tort actions against the United States for injury to members of the armed forces while on active duty. *Feres*, supra, at 146, 71 S.Ct. at 159.

Again in *Dalehite*, supra, the Supreme Court made it clear that it was unnecessary to define, apart from this case, precisely where discretion enters.

It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. *Dalehite*, supra, [346 U.S.] at 35. [73 S.Ct. at 967] Where there is room for policy judgment and decision, there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a casual step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

■ The Court, in applying the rules stated herein, concludes that "the liability assumed by the Government here is that created by 'all circumstances,' not that which a few of the circumstances might create." *Feres*, supra, 340 U.S. at 142, 71 S.Ct. at 157. As stated by the Supreme Court in *Dalehite*, supra, 346 U.S. at 45, 73 S.Ct. at 972, "It is our judgment that liability does not arise by virtue either of United States ownership of an 'inherently dangerous commodity' or property, or of engaging in an 'extra-hazardous' activity. *United States v. Hull*, 195 F.2d 64, 67 [5th Cir.]." It appears to this Court that *Dalehite*, supra, is not only persuasive but prevailing. The Court can reach no other conclusion under "all the circumstances." [7]

7. Notwithstanding the conclusions reached by the Court in this opinion, the Dissenting Opinion by Mr. Justice Jackson, joined by Mr. Justice Black and Mr. Justice Frankfurter, should, in doing justice to those injured, be the prevailing rule. As stated in the dissenting opinion:

But the magnitude of the potential liability is due to the enormity of the disaster and the multitude of its victims. The size of the catastrophe does not excuse liability but, on its face, eloquently pleads that it could not have resulted from any prudently operated government project, and that injury so sudden and sweeping should not lie where it has fallen. *Dalehite*, supra, [346 U.S.] at 54. [73 S.Ct. at 977]

I agree that it should at least raise doubts whether it was "one of those 'discretionary functions'" Congress sought to immunize from liability.

However, the majority opinion prevails and no case has been cited that changes the rule of

Since the Court determines the discretionary function exception applies in these cases, it is a bar to liability on the part of the government. Therefore, having concluded that the government is immune from liability, it is not necessary to reach the other issues, although they have been ably discussed by the parties. For the Court to consider and analyze each of the issues would cause this opinion to be unnecessarily lengthy. Accordingly, summary judgment is appropriate and will be granted.

The findings of fact and conclusions of law are incorporated herein pursuant to Rule 52 of the Federal Rules of Civil Procedure.

A separate order will be entered in accordance with this opinion.

the majority opinion in *Dalehite v. United States*, supra. It might be noted after the *Dalehite* decision, Congress in 1955 passed the Texas City Explosion Relief Act to provide relief for victims of the explosion of ammonium nitrate fertilizer in 1947. *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 86, fn. 31, 98 S.Ct. 2620, 2637, 57 L.Ed.2d 595 (1977). In view of the tragedy here, perhaps similar action should be considered.